GIBBONS, J., delivered the léad opinion in which SILER, COOK, McKEAGUE, WHITE, and DONALD, JJ., joined, and ROGERS, J., joined in part. McKEAGUE (pgs. 699-700), and WHITE (pp. 700-02), JJ., delivered separate concurring opinions. BOGGS, J. (pg. 702), BATCHELDER, J. (pp. 702-07), in which BOGGS, J., joined, and SUTTON, J. (pp. 707-14), in which BOGGS, McKEAGUE, and KETHLEDGE, JJ., joined, delivered *681 separate opinions concurring in most of the judgment. ROGERS, J. (pg. 714), delivered a separate opinion concurring in the lead opinion in part, dissenting from the result, and joining Part II.B. of the dissenting opinion of MOORE, J. MOORE, J. (pp. 714-21), delivered a separate ■ dissent in which COLE, C. J., CLAY, ' GRIFFIN, and STRANCH, JJ., joined, and ROGERS, J., joined in part.
OPINION
JULIA SMITH GIBBONS, Circuit Judge,
Plaintiff-Appellant Clifford Charles Tyler, a prospective gun purchaser, was involuntarily committed thirty years ago following an emotional divorce. Despite being three decades removed from this brief depressive episode, and despite a currently clean bill of mental health, Tyler is ineligible to possess a firearm because of his prior involuntary commitment, pursuant to 18 U.S.C. § 922(g)(4). After the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) declined to review his petition for restoration of his right to own a firearm, Tyler filed suit in federal court seeking a declaratory judgment that § 922(g)(4) is unconstitutional as applied to him. The district court dismissed Tyler’s suit for failure to state a claim.
Since 2008, the lower courts have struggled to delineate the boundaries of the right recognized by the Supreme Court in District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Tyler’s case presents an important question in light of the Supreme Court’s decision. On the one hand, the Heller Court recognized, for the first time, that the Second Amendment protected the fundamental right of “law-abiding, responsible citizens” to own firearms. Id. at 635, 128 S.Ct. 2783. On the other, it recognized that this right was not “unlimited” and observed that longstanding prohibitions on the possession of firearms by felons and the mentally ill are “presumptively lawful.” Id. at 595, 626-27 n. 26, 128 S.Ct. 2783. We must decide whether, in consideration of Heller, Tyler, “who has been committed to a mental institution,” § 922(g)(4), has a cognizable claim under the Second Amendment and, if so, how to properly scrutinize his claim.
The district court dismissed Tyler’s suit for failure to state a claim, reasoning that Heller[1] s statement regarding “presumptively lawful” prohibitions on the mentally ill ■ foreclosed such claims. The court also observed that § 922(g)(4). would survive intermediate scrutiny. Unlike the district court, we do not understand Heller*s pronouncement about presumptively lawful prohibitions to insulate § 922(g)(4) from constitutional scrutiny nor do we believe ■that on the. record as it currently stands the government has carried its burden to show that § 922(g)(4)’s permanent ban is substantially related to the government’s important interests in reducing crime and preventing suicide. Because Tyler’s complaint states a valid claim under the Second Amendment, we reverse and remand.
I. Background
A. Statutory and Regulatory Background
18 U.S.C. § 922(g) of the Gun Control Act prohibits numerous categories of people from gun ownership, including convicted felons, § 922(g)(1), habitual drug users, § 922(g)(3), and domestic-violence misde-meanants, § 922(g)(9). The act also prohibits anyone “who has been adjudicated as a mental defective or who has been committed to a mental institution” from possessing a firearm. '§ 922(g)(4), Federal regulations make clear that “committed to a *682 mental institution” applies only to persons who are involuntarily committed by an appropriate judicial authority following due process safeguards. See 27 C.F.R. § 478.11 (defining “committed to a mental institution”). -
Besides categorical bans, the Act also includes a relief-from-disabilities program under which barred individuals may apply “to the Attorney General for relief from the disabilities imposed by Federal laws.” 18 U.S.C. § 925(c). Authority to administer the relief-from-disabilities program has been delegated to the director of the ATF. 28 C.F.R. § 0.130(a)(1); 27 C.F.R. § 478.144(b) (providing that “[a]n application for such relief shall be filed ... with the Director [of ATF]”). Under § 925(c), the ATF director is empowered to grant relief if he or she is satisfied “that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest.” Judicial review is available in the federal district court of appropriate jurisdiction to “[a]ny person whose application for relief ... is denied by the [ATF].” Id. The reviewing court is empowered to “admit additional evidence where failure to do so would result in a miscarriage of justice.” Id. The ATF’s decision is reviewed under an arbitrary and capricious standard. United States v. Bean, 537 U.S. 71, 77-78, 123 S.Ct. 584, 154 L.Ed.2d 483 (2002).
Section 925(c), however, is currently a nullity. Congress defunded the relief-from-disabilities program in 1992, noting that reviewing applications was a “very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made.” S. Rep. No. 102-353, at 19 (1992). Congress has reaffirmed its appropriations restrictions numerous times since then. See Bean, 537 U.S. at 75 n.3, 123 S.Ct. 584 (listing subsequent appropriations decisions); Mullis v. United States, 230 F.3d 215, 219 (6th Cir. 2000). Moreover, the Supreme Court has held that Congress’s decision to defund the program stripped the federal courts of jurisdiction to review claims arising under § 925(c). Bean, 537 U.S. at 78, 123 S.Ct. 584 (“[T]he absence of an actual denial of [a] respondent’s petition by ATF precludes judicial review under § 925(c)”).
Still, in early 2008, Congress renewed the possibility that certain prohibited individuals could have their right to possess a gun restored. Seeking to remedy weaknesses in the national instant criminal background check system (NICS), Congress authorized federal grants to encourage the states to supply accurate and up-to-date information to federal firearm databases. See NICS Improvement Amendments Act of 2007, Pub. L. No. 110-180, § 103,121 Stat. 2559, 2567 (2008). Eligibility for the grants is based, in part, on the creation of a relief-from-disabilities program that allows individuals barred by § 922(g)(4) to apply to have their rights restored. Id. at §§ 103, 105, 121 Stat. at 2568-69.[1] Under qualifying programs, “a State court, board, commission, or other lawful authority shall grant the relief ... if the circumstances regarding the disabilities ... and the person’s record and reputation, are such that the person will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest.” Id. § 105(a)(2), 121 Stat. at *683 2569-70. The state program must also “permit[ ] a person whose application ... is.denied to file a petition with the State court of appropriate jurisdiction for a de novo judicial review of. the denial.” Id. § 105(a)(3), 121 Stat. at 2570. The government represented in its supplemental brief .that thirty-one states have created qualifying relief programs.[2] Tyler’s home state of Michigan is not one of them.
B. Factual Background
The complaint and attached documents set out the factual background of the case. Tyler is a seventy-four-year-old resident of Hillsdale County, Michigan. According to a 2012 substance-abuse evaluation, in 1985, Tyler’s wife of twenty-three years, ran away with another man, depleted Tyler’s finances, and then served him with divorce papers. The ordeal left Tyler emotionally devastated. He had trouble sleeping and sat at home “in the middle of the floor ... pounding his head.” (DE 1-1,- Ex. C, Page ID 23.) Fearing-that their father was a danger to himself, Tyler’s daughters contacted local police, who transported Tyler to the Sheriffs department and began the necessary steps for Tyler to receive a psychological evaluation.
On January 2, 1986, Tyler, represented by counsel, appeared before the Hillsdale County Probate Court. Court documents indicate that Dr. Tamara Marie Tyler[3] examined Tyler. She concluded that Tyler required in-patient treatment and petitioned the probate court to have Tyler committed. The probate court found by “clear and convincing evidence” that Tyler was mentally ill and that because of his illness he could “be reasonably expected within the near future to intentionally or unintentionally seriously physically injure [himself] or others, and has engaged in an act or acts or made significant threats that are substantially supportive of the expectation.” (DE 1-2, Ex. F, Page ID 36.) The court further noted that hospitalization was the only treatment method “adequate to meet [Tyler’s] treatment needs.” (Id.)
The court committed Tyler to Ypsilanti Regional Center “for a period not to exceed 30 days” and ordered him to undergo further treatment “for a period not to exceed 90 days.” (Id. at 36-37.) According to his 2012 substance-abuse evaluation, when Tyler arrived at Ypsilanti Regional Center, he was depressed and had bruises on his head and face. Tyler reported that he stayed at the in-patient center for two to four weeks[4] but declined prescription medication for fear it would alter his “thinking.” (DE 1-1, Ex. C, Page ID 23.) Tyler also reported that he received no follow-up therapy after he was discharged from the hospital.
After his discharge, Tyler returned home and successfully held a job for the next eighteen or nineteen years. He also remarried in 1999. In 2012 Tyler underwent both a substance-abuse and a psychological evaluation. During his psychological evaluation, Tyler reported that he has “never experienced a depressive episode” *684 other than the one following his divorce. (DE 1-rl, Ex. B, Page ID 19.) He also stated that he maintains a close relationship with his daughters and that he has repaired his relationship with his ex-wife. Dr. Osentoski observed that Tyler’s “[c]og-nitive ability appeared to be in the average range” and that there was “no-evidence of thought disorder ... [or] hallucinatory phenomena.” (Id. at 20.) She also noted that Tyler’s personal physician reported no signs of mental illness. Osentoski concluded that Tyler’s response to his divorce was a “brief reactive depressive episode,” but that, at the time of his evaluation, Tyler did not present any “evidence of mental illness.” (Id,) Tyler’s substance-abuse evaluation reveals no issues with alcohol or drug abuse, and it notes that Tyler has had no past legal involvement.
C. Procedural History
Tyler alleges that, on February 7, 2011, he unsuccessfully attempted to purchase a gun. The Hillsdale County Sheriffs Office informed Tyler that he was ineligible to purchase a firearm because the NICS Background Check System indicated that he had previously been committed to a mental institution. In August 2011, Tyler appealed the denial to the FBI’s NICS section. On January 6, 2012, the NICS section denied Tyler’s appeal, explaining that the NICS Improvement Amendments Act of 2007 “provides states with the ability to pursue an ATF-approved relief of disability for individuals ... who have been committed to a mental institution” but that “[ujntil [Michigan] has an ATF approved relief from disabilities program in place [Tyler’s] federal firearm rights may not be restored.” (DE 1, Compl. ¶ 33, Page ID 7; DE 1-2, Ex. G, Page ID 39-40.)
On May 21, 2012, Tyler sued various county, state, and federal defendants in federal court.[5] He alleged that, given Michigan’s lack of relief-from-disabilities program, § 922(g)(4) was unconstitutional as applied to him because it operated as an essentially permanent ban on his fundamental Second Amendment right to keep and bear arms. Tyler also averred that § 922(g)(4), as applied, violates the equal protection clause and that the government’s failure to afford him notice and an opportunity to be heard on the matter violates the Due Process clauses of the Fifth and Fourteenth Amendments.
The federal defendants moved to dismiss Tyler’s complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion, relying on Heller’s observation that prohibitions on.the possession of firearms by the mentally ill were presumptively lawful and concluding that Tyler was not within the ambit of the Second Amendment as historically understood. The court went on to conclude that § 922(g)(4) would survive intermediate scrutiny. The court focused -heavily on Congress’s decision to rely on prior judicial determinations in commitment proceedings and reasoned that there was a substantial relationship between the government’s interest in keeping firearms out of the hands of presumptively risky people and § 922(g)(4)’s prohibition, even without a means for post-commitment review. After the court dismissed Tyler’s claims against the federal defendants, the remaining parties agreed that the court’s rationale would likewise foreclose claims against the county defendants. The parties *685 also recognized and agreed that Tyler’s claims under the Fifth and Fourteenth Amendments were coterminous with his Second Amendment claim. Tyler’s Second Amendment claim is the only issue on appeal.
II. Standard of Review
We review de novo the district court’s dismissal for failure to state a claim. Ass’n of Cleveland Fire Fighters v. City of Cleveland, Ohio, 502 F.3d 545, 548 (6th Cir. 2007). We must accept the factual allegations in the plaintiffs complaint as true and construe the complaint in the light most favorable to the plaintiff. Hill v. Blue Cross & Blue Shield of Mich., 409 F.3d 710, 716 (6th Cir. 2005).
III. Analysis
The Second Amendment provides: “A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.” U.S. Const, amend. II. The Supreme Court recognized in Heller that the amendment secures “an individual right to keep and bear arms” without regard to militia service. 554 U.S. at 577, 595, 128 S.Ct. 2783. The core right recognized in Heller is “the right of law-abiding, responsible citizens to use arms in defense of hearth and home.” Id. at 635, 128 S.Ct. 2783.
This right, however, is “not unlimited, just as the First Amendment’s right of free speech [is] not.” Id. at 595, 128 S.Ct. 2783. For example, the Heller court noted that the Second Amendment does not confer a right to possess any kind of weapon for whatever reason. Id. at 595, 627, 128 S.Ct. 2783 (noting that the Second Amendment does not protect “the right of citizens to carry arms for any sort of confrontation” and recognizing the “historical tradition of prohibiting the carrying of dangerous and unusual weapons” (citations and internal quotation marks omitted)). The Court also recognized the government’s power to restrict the “carrying of firearms in sensitive places such as schools and government buildings.” Id. at 626, 128 S.Ct. 2783. In addition to the what and the %ohere of the Second Amendment, the Heller court also identified who the government may presumptively regulate. Whereas “law-abiding, responsible citizens” are at the core of the Amendment’s protections, “longstanding prohibitions on the possession of firearms by felons and the mentally ill” are “presumptively lawful.” Id. at 626-27 & n. 26, 635, 128 S.Ct. 2783.
Tyler’s claim implicates one of these presumptively lawful regulations governing who may possess a firearm, § 922(g)(4). He asserts that the Second Amendment forbids Congress from permanently prohibiting firearm possession by currently healthy individuals who were long ago committed to a mental institution.
A.
Like several of our sister circuits, we have adopted a two-step framework to resolve Second Amendment challenges. United States v. Greeno, 679 F.3d 510, 518 (6th Cir. 2012); United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010); United States v. Chester (Chester I), 628 F.3d 673, 680 (4th Cir. 2010); United States v. Reese, 627 F.3d 792, 800-01 (10th Cir. 2010). The first step “asks whether the challenged law burdens conduct that falls within the scope of the Second Amend-, ment right, as historically understood.” Greeno, 679 F.3d at 518 (citing Chester I, 628 F.3d at 680). If the government establishes that the challenged law regulates activity outside the scope of the Second Amendment as understood at the time of the framing of the Bill of Rights, the activity is unprotected and the law is not sub *686 jected to further constitutional scrutiny. Id. If, however, the historical evidence is inconclusive or suggests that the regulated activities — or in our case the regulated individuals — are not categorically unprotected, then we must ascertain the appropriate level of scrutiny and examine the “strength of the government’s justification for restricting or regulating the exercise of Second Amendment rights.” Id. (quoting Ezell v. City of Chicago, 651 F.3d 684, 703 (7th Cir. 2011)). Heller rejected rational-basis review but otherwise left the issue open. 554 U.S. at 628 n.27, 128 S.Ct. 2783. Thus, unless the conduct at issue is categorically unprotected, the government bears the burden of justifying the constitutionality of the law under a heightened form of scrutiny.
Before beginning our two-step inquiry, however, we must answer a threshold question: To what extent does Heller itself provide an answer to the constitutionality of § 922(g)(4) as applied to Tyler? As noted above, the Heller Court recognized that the Second Amendment secures and protects an individual right to keep and bear arms. 554 U.S. at 595, 128 S.Ct. 2783. But the Court also noted that the right was “not unlimited” and cautioned that “nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill.” Id. at 595, 626, 128 S.Ct. 2783. The Heller Court called these longstanding prohibitions “presumptively lawful.” Id. at 627 n. 26, 128 S.Ct. 2783. The Court’s assurances confirm that the Second Amendment is not an absolute barrier to congressional regulation of firearms and that some categorical prohibitions are assumed to be constitutional. See United States v. Carter (Carter I), 669 F.3d 411, 420-21 (4th Cir. 2012); United States v. Skoien (Skoien II), 614 F.3d 638, 641 (7th Cir. 2010) (en banc) (“[S]ome categorical disqualifications are permissible: Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons.... ”). However, in making this observation, the Court expressly noted that it was not “clarifying] the entire field” of the Second Amendment, and, importantly, the Court reserved for later cases an exploration of the historical justifications for its enumerated prohibitions. Heller, 554 U.S. at 635, 128 S.Ct. 2783.
Heller does not resolve this case on its own terms. While we “are obligated to follow Supreme Court dicta,” United States v. Marlow, 278 F.3d 581, 588 n.7 (6th Cir. 2002) (citation omitted), Heller only established a presumption that such bans were lawful; it did not invite courts onto an analytical off-ramp to avoid constitutional analysis.[6] A presumption implies “that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge.” United States v. Williams, 616 F.3d 685, 692 (7th Cir. 2010) (applying-intermediate scrutiny in challenge to § 922(g)(1)); Chester I, 628 F.3d at 679 (“[T]he phrase ‘presumptively lawful regulatory measures’ suggests the possibility that one or more of these ‘longstanding’ regulations ‘could be unconstitutional in the face of an as-applied challenge.’” (quoting Williams, 616 F.3d at 692)). We do not take Heller’s “presump *687 tively lawful” dictum to foreclose § 922(g)(4) from constitutional scrutiny. The mere fact that Congress created a categorical ban does not give the government a free pass; it must still be shown that the presumption applies in the instant case.[7] See Williams, 616 F.3d at 692. As the Seventh Circuit has recognized, the Heller Court’s observation regarding the presumptive lawfulness of longstanding bans is precautionary, not conclusive:
Instead of resolving questions such as the one we must confront, the Justices have told us that the matters have been left open. The language ,.. warns readers not to treat Heller as containing broader holdings than the Court set out to establish: that the. Second Amendment. creates individual rights, one of which is keeping operable handguns at .home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open. The opinion is not a comprehensive code; it is just an explanation for the Court’s disposition.
Skoien II, 614 F.3d at 640 (emphasis added).
Refusing to give Heller conclusive effect in this case is particularly proper given § 922(g)(4)’s lack of historical pedigree. Heller’s analytical structure and its conclusions command resort to historical evidence in determining the scope of the Second Amendment. Although the Supreme Court observed that bans on gun possession by the mentally ill are “longstanding,” Heller, 554 U.S. at 626, 128 S.Ct. 2783, “legal limits on the possession of firearms by the mentally ill ... are of 20th Century vintage.” Skoien II, 614 F.3d at 641. Indeed, § 922(g)(4) was not enacted until 1968. Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, 1220. As will be explained in more detail below, the parties have produced' scant historical evidence conclusively supporting a permanent ban on the possession of guns by anyone who has been committed to a mental institution. In the absence of such evidence, it would be odd to rely solely on Heller to rubber stamp the legislature’s power to permanently exclude individuals from a fundamental right based on a past involuntary commitment.
Heller spoke of bans on “the mentally ill.” 554 U.S. at 626, 128 S.Ct. 2783. While we can only guess whether the Heller Court had in mind § 922(g)(4) as opposed to state restrictions, or no particular restriction at all[8] — we note that § 922(g)(4) does not use the phrase “mentally ill,” nor does it attempt to prohibit all currently mentally ill persons from firearm possession. Rather, the statute uses prior judicial adjudications — incompetency and involuntary commitment — as proxies for mental illness. See United States v. Rehlander, 666 F.3d 45, 50 (1st Cir. 2012) (“[Ejection 922(g)(4) does not bar firearms possession for those who are or were mentally ill and dangerous, but (pertinently) only for any person ‘who has been adjudicated as a mental defective’ or ‘has been committed to a. mental institution.’ ”). Prior involum *688 tary commitment is not coextensive with current mental illness: a point the government concedes in its brief, and a point Congress recognized when it enacted the NICS Improvement Amendments Act, thereby allowing states to restore the right to possess a gun to persons previously committed. 153 Cong. Rec. 28,948 (2007) (statement of Rep. C. McCarthy) (“[rjecog-niz[ing] that mental illness is not necessarily a permanent impediment” and noting that the NICS “would ... allow States to establish procedures that permit a person disqualified on the basis of legal mental illness to prove to the State that he or she no longer poses a danger to society”) Therefore, we may not resolve this case solely in reliance on Heller*s precautionary language, as we did in rejecting a Second Amendment challenge' to a denial of an expungement motion in a case involving § 922(g)(l)’s bar on the possession of firearms, by felons. See United States v. Carey, 602 F.3d 738, 740-41 (6th Cir. 2010).[9]
To rely solely on Heller* s presumption here would amount to a judicial endorsement of Congress’s power to declare, “Once mentally ill, always so.” This we will not do. Heller*s presumption of lawfulness should not be used to enshrine a permanent stigma on anyone who has ever been committed to a mental institution for whatever reason. Some sort of showing must be made to support Congress’s adoption of prior involuntary commitments as a basis for a categorical, permanent limitation on the Second Amendment right to bear arms. This conclusion is particularly appropriate in this case. Tyler’s complaint and supporting documents suggest that Tyler is thirty years removed from a brief depressive episode and that he has had no intervening mental health or substance abuse problems since that time. This factual scenario calls into question the applicability of § 922(g)(4)’s lifetime ban to Tyler and likewise calls into question the applicability of Heller*s presumption of lawfulness to his Second Amendment claim. With this understanding in place, we proceed to consider. Tyler’s claim under our two-step framework.
B. Greeno Step One
Greeno’s first step asks “whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood.” 679 F,3d at 518 (citation omitted). Laws that regulate activity “falling outside the terms of the right as publicly understood when the Bill of Rights was ratified” will survive constitutional scrutiny. Id. (citation omitted). Because the relevant portion of § 922(g)(4) prohibits a class of persons — those with a prior involuntary commitment — we must determine whether those people, rather than their conduct, fall completely outside the reach of the Second Amendment. See Chester I, 628 F.3d at 680; Skoien II, 614 F.3d at 649 (Sykes, J., dissenting). The government bears , the burden at step one to conclusively demonstrate that the challenged statute burdens persons historically understood to fye unprotected. See Greeno, 679 F.3d at 518.
The government relies on both historical sources and historical scholarship to trace § 922(g)(4)’s historical lineage. First, it refers to “a proposal offered by the Pennsylvania anti-federalist faction at the Pennsylvania Convention.” (CA6 R. 43, Appellee *689 Br. at 17.) The proposal states in relevant part that “no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from, individuals.” The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787, reprinted in 2 Bernard Schwartz, The Bill of Rights, A Documentary History 665 (1971) (emphasis added). The government also cites Samuel Adams’s proposal at the Massachusetts ratifying convention. The proposal recommended that “the said Constitution be never construed to authorize Congress ... to prevent the people of the United States who are peaceable citizens, from keeping their own arms.” Id. at 675, 681 (emphasis added). While these sources provide a clear basis for Heller’s recognition that “law-abiding, responsible citizens” are at the core of the Second Amendment, they move us no closer to an understanding of which individuals were considered part of that group in 1791.
The government also posits that Second Amendment scholars “agree that the right to bear arms was tied to the concept of a virtuous citizenry.” (Appellee Br. at 18 (quoting Yancey, 621 F.3d at 684-85).) But, again, that the Founders understood the Amendment to protect the virtuous does not explain who was counted among that class. In an attempt to justify the lack of historical evidence, the government relies on a passage from Yancey explaining that “the absence of historical statutory prohibitions on firearm possession [by the mentally ill] may have been the consequence of th‘e fact that ‘in'eighteenth-century America, justices of the peace were authorized to lock up lunatics who were dangerous.’ ” 621 F.3d at 685 (quoting Carlton F.W. Larson, Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit, 60 Hastings L.J. 1371, 1377 (2009)). However, Professor Larson, in the same article relied on by Yancey, noted that “[o]ne searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership.” 60 Hastings L.J. at 1376.
Ultimately, we agree with the district court that the “historical evidence cited by Heller and [the government] does not directly support the proposition that persons who were once committed due to mental illness are forever ineligible to regain their Second Amendment rights.” (DE 28, Opinion, Page ID 239-40.)
Despite the lack of conclusive historical support, however, the district court, relying on Heller’s “presumptively lawful” dictum, concluded that “the government has satisfied its burden of establishing that the Second Amendment, as historically understood, does not extend to [Tyler].” (Id. at 240.) The government urges this same conclusion on appeal. It,argues that “the Supreme Court’s statement in Heller that restrictions on gun ownership by the mentally ill and felons are ‘presumptively lawful’ indicates that prohibiting these groups of individuals from possessing firearms does not implicate the Second Amendment.” (CA6 R. 62, Appellee’s Supplemental Br. at 8.) Given that the district court came to what we see as contradictory conclusions about the place of mentally ill persons within the historical scope of the Second Amendment, the need arises to clarify how the Heller Court’s “presumptively lawful” language should inform our two-step analysis. 554 U.S. at 627 n.26,128 S.Ct. 2783.
To be certain, Heller’s dictum bears an uncertain relationship with the two-pronged approach we use to analyze *690 Second Amendment claims.[10] This tension is particularly acute in cases like Tyler’s where the regulation at issue is of the type expressly mentioned by the Heller court. In mapping Heller's “presumptively lawful” language onto the two-step inquiry, it is difficult to discern whether prohibitions on felons and the mentally ill are presumptively lawful because they do not burden persons within the ambit of the Second Amendment as historically understood, or whether the regulations presumptively satisfy some form of heightened means-end scrutiny. Ultimately, the latter understanding is the better option. See Chester I, 628 F.3d at 679 (“[E]ven if the listed regulations were not historical limitations on the scope of the Second Amendment, the Court could still have viewed the regulatory measures as ‘presumptively lawful’ if it believed they were valid on their face under any level of means-end scrutiny applied.”). The Heller Court expressly declined to expound upon the historical justifications for bans on firearm possession by felons and the mentally ill. 554 U.S. at 635, 128 S.Ct. 2783. In the face of what is at best ambiguous historical support, it would be peculiar to conclude that § 922(g)(4) does not burden conduct within the ambit of the Second Amendment as historically understood based on nothing more than Hellers observation that such a regulation is “presumptively lawful.” 554 U.S. at 627 n.26, 128 S.Ct. 2783. We proceed to step two, then, with an understanding that people who have been involuntarily committed are not categorically unprotected by the Second Amendment.
C. Greeno Step Two
Under Greeno, if the government does not meet its burden of establishing that the regulated conduct fell outside the scope of the Second Amendment as historically understood at the framing, then we proceed to analyze “the strength of the government’s justification for restricting or regulating the exercise of Second Amendment rights.” 679 F.3d at 518. It is here where we must decide and apply the appropriate level of scrutiny. Because Heller rules out rational basis, the choice is between intermediate and strict scrutiny. 554 U.S. at 628 n.27, 128 S.Ct. 2783 (“If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.”); see also Chester I, 628 F.3d at 682. Given Heller's focus on “core” Second Amendment activity, our choice of scrutiny level should be informed by “(1) ‘how close the law comes to the core of the Second Amendment right,’ and (2) ‘the severity of the law’s burden on the right.’ ” United States v. Chovan, 735 F.3d 1127, 1138 (9th Cir. 2013) (quoting Ezell, 651 F.3d at 703); see also Chester I, 628 F.3d at 682.
Although Tyler’s position on the appropriate level of scrutiny has changed during the pendency of his appeal, before the en banc court he asserts that strict scrutiny is appropriate. He maintains that (1) he “is the sort of responsible, law-abiding citizen *691 that Blackstone and the Supreme Court have recognized” at the core of the Second Amendment, and that (2) § 922(g)(4) completely and permanently extinguishes his core right to use a firearm in defense of hearth and home and thus triggers strict scrutiny. (CA6 R.53, Appellant’s Supplemental Br. at 8-9.) We will take these arguments in turn.
To hold, as Tyler requests, that he is at the core of the Second Amendment despite his history of mental illness would cut too hard against Congress’s power to categorically prohibit certain presumptively dangerous people from gun ownership. As the Seventh Circuit recognized, the Heller Court understood that Congress’s power to enact categorical disqualifications was “part of the original meaning” of the Second Amendment. Skoien II, 614 F.3d at 640. Reviewing § 922(g)(4) under strict scrutiny would invert Hellers presumption that prohibitions on the mentally ill are lawful. See Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd., 276 F.3d 876, 879 (6th Cir. 2002) (noting that under strict scrutiny, “[w]e start by presuming that the ordinance is unconstitutional”).[11] Moreover, “[t]he risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test.” Bonidy v. U.S. Postal Serv., 790 F.3d 1121, 1126 (10th Cir. 2015). In light of this cogent difference, we should caution against imposing too high a burden on the government to justify its gun safety regulations, particularly where Congress has chosen to rely on prior judicial determinations that individuals pose a risk of danger to themselves or others.
Tyler also argues that § 922(g)(4) completely and permanently extinguishes his core right to use a firearm in defense of hearth and home, and this heavy burden triggers strict scrutiny. Tyler gets it half right. In one way, § 922(g)(4) is a severe restriction. It permanently prohibits Tyler from possessing all types of firearms, even in his home. In another way, however, § 922(g)(4) is narrow. Like the other provisions of § 922(g), § 922(g)(4) does not burden the public at large; it burdens only a narrow class of individuals who are not at the core of the Second Amendment— those previously adjudicated mentally defective or previously involuntarily committed. See United States v. Reese, 627 F.3d 792, 802 (10th Cir. 2010) (opting to apply intermediate scrutiny to § 922(g)(8) in part because the “statute[ ] prohibits] the possession of firearms by [a] narrow class[ ] of persons who, based on their past behavior, are more likely to engage in domestic violence”). We add that the permanence of § 922(g)(4)’s prohibition does not necessarily require us to apply strict scrutiny. Sections 922(g)(1) and (9), which also impose permanent bans, have been consistently reviewed under intermediate scrutiny. See Chovan, 735 F.3d at 1138 (applying inter *692 mediate scrutiny in challenge to § 922(g)(9)); United States v. Booker, 644 F.3d 12, 26 (1st Cir. 2011) (applying the equivalent of intermediate scrutiny to § 922(g)(9)); United States v. Staten, 666 F.3d 154, 159 (4th Cir. 2011) (applying intermediate scrutiny in challenge to § 922(g)(9)); Chester I, 628 F.3d at 682-83 (same); Williams, 616 F.3d at 692-93 (applying intermediate scrutiny in challenge to § 922(g)(1)).
With strict scrutiny put aside, there is only one choice left: intermediate scrutiny. Intermediate scrutiny is preferable in evaluating challenges to § 922(g)(4) and similar prohibitions. See Bonidy, 790 F.3d at 1126 (reasoning that “intermediate scrutiny makes sense in the Second Amendment context” because of the inherent risk that the right of self-defense poses to others). Such an approach “appropriately places the burden on the government to justify its restriction[ ], while also giving [Congress] considerable flexibility to regulate gun safety.” Id. Section 922(g)(4) does not burden the core of the Second Amendment right, but it does place a substantial burden on conduct and persons protected by the Second Amendment. Accordingly, we conclude that intermediate scrutiny, is the appropriate standard.[12]
Many of our sister circuits have also held that intermediate scrutiny is applicable. In the wake of Heller, the federal courts of appeals have heard numerous constitutional challenges to the various prohibitions enumerated in § 922(g). A non-exhaustive review of these cases reveals a near unanimous preference for intermediate scrutiny.[13] As noted previously, courts have consistently applied intermediate scrutiny to § 922(g)(9)’s ban on convicted domestic-violence misdemeanants. See Chovan, 735 F.3d at 1137-38; Staten, 666 F,3d at 159; Booker, 644 F.3d at 25; Chester I, 628 F.3d at 682-83; Skoien II, 614 F.3d at 641-42 (requiring “some form of strong showing” approximating intermediate scrutiny). The Fourth Circuit has applied intermediate scrutiny to § 922(g)(3), which prohibits gun possession by drug addicts and unlawful users of controlled substances. See Carter I, 669 F.3d at 417; see also Yancey, 621 F.3d at 683 (declining to pick a specific form of scrutiny but requiring a “strong showing that [§ 922(g)(3)] was substantially related to an important governmental objective”). The Seventh Circuit has also applied intermediate scrutiny to § 922(g)(l)’s ban on gun ownership by felons. Williams, 616 F.3d at 692. Likewise, the Fourth and Tenth Circuits have subjected § 922(g)(8), which disallows gun possession by individuals subject to domestic protective orders, to intermediate scrutiny.[14] United States v. *693 Mahin, 668 F.3d 119, 124 (4th Cir. 2012); United States v. Chapman, 666 F.3d 220, 226 (4th Cir. 2012); Reese, 627 F.3d at 802.
D. Applying Intermediate Scrutiny
While the vocabulary of intermediate scrutiny varies across courts, “all forms of the standard require (1) the government’s stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective.” Chovan, 736 F.3d at 1139 (citation omitted); see also Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 466 (1988). “All that is required is ‘a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.’ ” Neinast v. Bd. of Trs. of Columbus Metro. Library, 346 F.3d 686, 694 (6th Cir. 2003) (quoting Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)). Because a perfect fit is not required, the government need not prove that there is “no burden whatsoever on [the claimant’s] ... right under the Second Amendment.” Chapman, 666 F.3d at 228.
i. Important Governmental Interest
The animating interest of § 922(g) “was to keep firearms out of the hands of presumptively risky people.” Dickerson v. New Banner Inst., Inc., 460 U.S. 103, 112 n.6, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983); see also Huddleston v. United States, 415 U.S. 814, 824, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974) (“The principal ¡purpose of the federal gun control legislation ... was to curb crime by keeping ‘firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.’ ” (quoting S. Rep. No. 90-1501, at 22 (1968))). In addition to this general interest, the government offers two additional rationales more specifically related to § 922(g)(4): protecting the community from-crime and preventing suicide. See 114 Cong. Rec. 21,829 (1968) (statement of Rep. Bingham) (noting Congress’s purpose in § 922(g)(4) to “cut down or eliminate firearms deaths caused by persons who áre not criminals, but who commit sudden, unpremeditated crimes with firearms as a result of mental disturbances”). These interests are not only legitimate, they are compelling. See Washington v. Glucksberg, 521 U.S. 702, 735, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997); Scholl v. Martin, 467 U.S. 253, 264, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984); see also United States v. Salerno, 481 U.S. 739, 747, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (“There is no doubt that preventing danger to the community is a legitimate regulatory goal.”); United States v. Masciandaro, 638 F.3d 458, 473 (4th Cir. 2011) (“Although the governmént’s interest need not be ‘compelling’ ünder intermediate scrutiny, cases have sometimes described the government’s interest in public safety in that fashion.”).

it. Is § 922(g)(4) Substantially Related to the Government’s Interest?

The question then becomes one of fit. The government must establish a reasonable fit between its important objectives of public safety and suicide prevention and its permanent ban on the possession of firearms by persons adjudicated to be mentally unstable, some of them long ago. See Chovan, 735 F.3d at 1140. Under intermediate scrutiny, “[t]he *694 burden of justification is demanding and it rests entirely on the State.” United States v. Virginia, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). In discharging this burden, the government can rely on a wide range of sources, including legislative history, empirical evidence, case law, and even common sense, but it may not “rely upon mere ‘anecdote and supposition.”’ Carter I, 669 F.3d at 418 (quoting United States v. Playboy Enter. Grp., Inc., 529 U.S. 803, 822, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000)).
The quantity and quality of support necessary “to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised.” Nixon v. Shrink Mo. Gov’t PAC, 528 U.S. 377, 391, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). While the Constitution may not require a specific method of proof, the Fourth Circuit’s experience with §§ 922(g)(3) and (9) illustrates that some reference to legislative findings, academic studies, or other empirical data is necessary to support the categorical disarmament of citizens, regardless of whether that disarmament is permanent or temporary.
In Chester I, the Fourth Circuit remanded a challenge to § 922(g)(9), which imposes a permanent ban on convicted domestic-violence misdemeanants. 628 F.3d at 674. In that case, the government offered “numerous plausible reasons why the disarmament of domestic violence mis-demeanants is substantially related to an important government goal,” but failed “to offer sufficient evidence” of such a substantial relationship. Id. at 683.[15] Likewise, another panel of the Fourth Circuit remanded a challenge to § 922(g)(3) despite the fact that its prohibition, unlike § 922(g)(9), has a “limited temporal reach” which “tracks the ongoing choices of individuals either to remain drug users or to quit drug abuse.” Carter I, 669 F.3d at 419, 421. In that case, the government chose “not to rely on academic research or other empirical data to demonstrate the connection between drug use and gun violence.” Id. at 418. While it recognized that the “record need not be as fulsome as that necessary to justify § 922(g)(9),” the court faulted the government’s decision to argue that § 922(g)(8)’s fit was “a matter of common sense.” Id. at 418-19.
As noted previously, the ban imposed by § 922(g)(4) on Tyler, and persons similarly situated to Tyler, is effectively permanent. Because § 925(c)’s relief-from-disabilities program remains unfunded and because Michigan has not chosen to create a qualifying relief program under the 2008 NICS Amendments, there is no path available for Tyler to seek the restoration of his Second Amendment right. The same is true for others barred by § 922(g)(4) in at least nineteen other states. Thus, some evidence of the continuing need to disarm those long ago adjudicated mentally ill is necessary to justify § 922(g)(4)’s means to its ends.
The government relies on both legislative history and empirical evidence to support § 922(g)(4). First, it points to legisla^ five observations about the role of mental illness in two public tragedies, the school shooting at Virginia Tech and a shooting in *695 New York. As Congress observed, individuals with proven histories of mental illness and with recent involuntary commitments perpetrated both shootings. (CA6 R.62 Ap-pellee’s Supplemental Br. at 18-19 (citing Pub. L. No. 110-180, §§ 2(9) & 121 Stat. at 2560; 153 Cong. Rec. H16926 (daily ed.) (Dec. 19, 2007) (statement of Rep. Boucher).))[16] This is compelling evidence of the need to bar firearms from those currently suffering from mental illness and those just recently removed from an involuntary commitment. It does not, however, answer why Congress is justified in permanently barring anyone who has been previously committed, particularly in cases like Tyler’s, where a number of healthy, peaceable years separate the individual from their troubled history.
In addition to these legislative observations, the Brady Center to Prevent Gun Violence has supplied studies showing that those with a past suicide attempt are more likely than the general public to commit suicide at a later date and that firearms are the most likely method for committing suicide.[17] (CA6 R. 70, Brady Center Ami-cus Br., at 12 & n.7 (citing Attempters’ Longterm Survival, Harvard Univ. Sch. of Pub. Health; Suicide and Self-Inflicted Injury, Centers for Disease Control & Prevention (Feb. 6, 2015), http://www.cdc. gov/nchs/fastats/suicide.htm).) This evidence helps to explain why it might be reasonable to prevent those with a past suicide attempt from ever possessing firearms, but it does not fully justify the need to permanently disarm anyone who has been involuntarily committed for whatever reason. Importantly, nothing in this record suggests that Tyler has ever attempted suicide or that a significant proportion of individuals prohibited by § 922(g)(4) have attempted suicide.
Likewise, the evidence relied on by the government in its motion to dismiss and seized on by Judge Moore’s dissent highlights why it may be appropriate to prohibit firearm ownership by currently mentally ill individuals and those who were recently committed, but it does little to justify § 922(g)(4)’s inflexible, lifetime ban. See Op. at 718-20 (Moore, J., dissenting); (DE 23, Gov’t Mot. to Dismiss; Page ID 171-73 (citing Frederick E. Vars & Amanda Adcock Young,- Do the Mentally III Have a Right to Bear Arms?, 48 Wake Forest L. Rev. 1, 21 (2013)).) One of the studies cited indirectly by the government, a meta-analysis of studies of those with prior involuntary commitments, clouds rather than clarifies the connection between prior commitment and future dangerousness. 48 Wake Forest L. Rev. at 21-22 (citing E. Clare Harris & Brian Barrac-lough, Suicide as an Outcome for Mental *696 Illness: A Meta-Analysis, 170 Brit. J. Psychiatry 205 (1997)). While the study did find that previously committed individuals have a suicide risk “thirty-nine times greater than that expected,” it explained that this risk was greatest “following short first admissions.” 170 Brit, J. Psychiatry at 220. Moreover, of the 14,000 patients studied in the meta-analysis, 98% were studied for only a year following their commitment, and the remaining 2% were studied anywhere from 2.5 to 8.5 years post-commitment. Id. at 219-20. The study ultimately concluded that “[s]uicide risk seems highest at the beginning of treatment and diminishes thereafter.” Id. at 223. In support of its motion to dismiss, the government also presented evidence that relapse and readmission are common following an initial commitment, (see DE 23, Gov’t Mot. to Dismiss, Page ID 174), but the studies the government relied on only analyzed behavior over 1-year and 22-month periods respectively and, thus, do not explain why a lifetime ban is reasonably necessary. (See id.)
. In its amicus brief, the States United to Prevent Gun Violence notes that after Connecticut began preventing individuals with prior commitments from purchasing firearms, the state “saw a 53% reduction in rates of violent crime perpetrated by such individuals.” (CA6 R. 81, Amicus Br. at 11.) This may be evidence that prohibiting gun possession lowers violent crime rates, but the data does not meaningfully compare previously committed individuals’ propensity for violence with that of the general population. And without such a comparison, the data is insufficient to justify § 922(g)(4)’s perpetual curtailment of a constitutional right. Add to that the findings of a study cited by Tyler in his briefs before this court, which compares the rates of violence committed by individuals discharged from psychiatric inpatient facilities and the general population in the same communities. (CA6 R. 19, Appellant Br. at 47-48 (citing Henry J. Steadman, et al., Violence by People Discharged from Acute Psychiatrict Impatient Facilities and by Others in the Same Neighborhoods, 55 Archives Gen. Psychiatry 393 (1998)).) The authors found that, when controlling for substance abuse problems, the rates of violent acts perpetrated by involuntarily committed patients and the general population in one community in Pittsburgh was “statistically indistinguishable.” 55 Archives Gen. Psychiatry at. 400. Moreover, the study’s “most unexpected finding [was] the decline in the proportion of subjects engaging in violence over time.” Id. The authors opined that “[rjates of violence may peak around the time of hospital admission, when patients are in acute crisis, and remain high for a period of time after discharge because many patients still have active mental disorders after they leave the hospital.” Id.
The government has not presented sufficient evidence of the continued risk presented by persons who were previously committed. Such evidence has been integral in decisions upholding other portions of § 922(g) that impose permanent bans. For instance, the Fourth Circuit, in upholding § 922(g)(9) under intermediate scrutiny, relied on empirical studies estimating the overall domestic violence recidivism rate to be between 35% and 80% and arrived at “a conservative conclusion ... that the actual recidivism rate among domestic violence misdemeanants- (including re-arrests and unreported incidents) is at least 33.3%.” Staten, 666 F.3d at 166-67, The court also noted that “the Seventh Circuit sitting en banc and the First Circuit have relied upon this same social science evidence to conclude that the recidivism rate among domestic violence misdemeanants is high.” Id. at 166 (citing Booker, 644 F.3d at 26; Skoien II, 614 *697 F.3d at 644); see also Chovan, 735 F.3d at 1140 (relying on the same evidence cited in Skoien II, 614 F.3d at 644, to conclude that “a high rate of domestic violence recidivism exists”). Likewise; the Seventh Circuit also upheld § 922(g)(1) under intermediate scrutiny based, in part, on a study that showed the likelihood that convicted robbers, like the plaintiff, were highly likely to recidivate. Williams, 616 F.3d at 693 (citing Note, Selective Incapacitation: Reducing. Crime Through Predictions of Recidivism, 96 Harv. L. Rev. 511, 515 & n.24 (1982)).
Relatedly, the temporal limitation of other § 922(g) bans has been a key consideration in finding that those regulations pass muster under heightened scrutiny. See, e.g., Mahin, 668 F.3d at 125 (noting that § 922(g)(8) is “exceedingly narrow” because it only applied “for the limited duration of [a] domestic violence protective order”); Carter I, 669 F.3d at 419 (upholding § 922(g)(3) under intermediate scrutiny in large part because “Congress tailored [§ 922(g)(3) ] to cover only the time period during which it deemed [drug users] to be dangerous”); Chapman, 666 F.3d at 228 (finding that § 922(g)(8) satisfied intermediate scrutiny’s reasonably fit requirement in large part because its regulatory sweep was limited to the duration of a domestic violence protective order); Yancey, 621 F.3d at 686-87 (upholding § 922(g)(3) under intermediate scrutiny, in part, because plaintiff “could regain his right to possess a firearm simply by ending his drug abuse” and “[i]n that sense, the restriction in § 922(g)(3) is far. less onerous than those affecting felons and the mentally ilF).
None of the government’s evidence squarely answers the key question at the heart of this case: Is it reasonably necessary to forever bar all previously institutionalized persons from owning a firearm? But perhaps the biggest problem for the government is Congress’s most recent answer to this very question: No, it is not. From 1986 to 1992, federal law provided a relief-from-disabilities ■ program whereby individuals prohibited by federal law from possessing firearms' could “appl[y] to the Attorney General for relief from [their] disabilities.” § 925(c).' In 1992, Congress deftmded this program, noting that reviewing applications was a “very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made.” S. Rep. No. 102-353, at 19 (1992). In 2008, Congress changed its mind. It authorized federal grants to the states for their help in shoring up the NICS instant background check system after a gunman with “a proven history of mental illness” killed dozens at Virginia Tech. See NICS Improvement Amendments Act of 2007, Pub. L. No. 110-180, § 2(9) (Findings), 122 Stat. 2559, 2560 (2008). To receive federal funds, states are required to create a relief-from-disabilities program that allows individuals barred by § 922(g)(4) to apply to have their rights restored. Id. at §§ 103, 105, 122 Stat. at 2568-69. According to the government, thirty-one states, currently have such relief programs. The NICS Improvement Amendments Act is a less restrictive alternative to the permanent bar created by § 922(g)(4). It is a clear indication that Congress does not believe that previously committed persons are sufficiently dangerous as a class to permanently .deprive all such persons of their Second Amendment right to bear arms.
The government urges a comparison of this case to Chapman, where the Fourth Circuit rejected an as-applied challenge to § 922(g)(8). 666 F.3d at 231. The court observed that the statute’s constitutionality was not undermined even though it may be “somewhat over-inclusive” be *698 cause “not every person who falls within[ ] it would misuse a firearm ... if permitted to possess one.” Id. Based- on this passage, the government concludes that § 922(g)(4) “would not be unconstitutional even if plaintiff could demonstrate that there were some number of people who were involuntarily committed to a mental institution in the past, but pose no greater risk of firearms violence than the general public currently,” (CA6. R. 62, Supplemental Br. at 17.) We agree. Under intermediate scrutiny, a statute can permissibly regulate more conduct (or more people) than necessary. However, the amount of overreach must be reasonable, and it is the government’s burden, not Tyler’s, to prove that § 922(g)(4)’s “scope is in proportion to the interest served.” Neinast, 346 F.3d at 594 (quoting Fox, 492 U.S. at 480, 109 S.Ct. 3028). In this light, the passage from Chapman has limited usefulness. First, § 922(g)(8) is not analogous to § 922(g)(4) because § 922(g)(8)’s bar is limited to the duration of a domestic court order. Second, without any longitudinal evidence documenting that previously committed people, on average, pose- a greater threat of violence than members of the general public, we have no way of knowing if § 922(g)(4)’s permanent ban is “somewhat over-inclusive” or if it is much more so.
We recognize that “[sjound policymak-ing often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable.” Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 665, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). And we recognize that in the context of gun safety, “the expense and other difficulties of individual determinations” may necessitate “the inherent imprecision of a prophylactic rule.” Weinberger v. Salfi, 422 U.S. 749, 777, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). Our opinion should not be taken to call into question Congress’s power to regulate categorically in this arena.[18] *699 However, § 922(g)(4) imposes a lifetime ban on a fundamental constitutional right. More evidence than is currently before us is required to justify such a severe restriction.
We cannot conclude, based on the current record, that the government has carried its burden to establish a reasonable fit between the important goals of reducing crime and suicides and § 922(g)(4)’s permanent disarmament of all persons with a prior commitment. There is no indication of the continued risk presented by people who were involuntarily committed many years ago and who have no history of intervening mental illness, criminal activity, or substanee abuse. Indeed, Congress’s evidence seems to focus solely on the risk posed by those presently mentally ill and who have been recently committed. Any prospective inference we may draw from that evidence is undercut by Congress’s recognition, in the 2008 NICS Amendments, that a prior involuntary commitment need not be a permanent impediment to gun ownership.
IV. Conclusion
Thus, we conclude that Tyler has a viable claim under the Second Amendment and that the government has not justified a lifetime ban on gun possession by anyone who has been “adjudicated as a mental defective” or “committed to a mental institution,” 18 U.S.C; § 922(g)(4). Because there are a number of separate opinions in this case, it is imperative that we clearly state the next steps. As I read the opinions, ten of us would reverse the district court; six of us would not. And at least twelve of us agree that intermediate scrutiny should be applied, if we employ a scrutiny-based analysis. It seems therefore that, given the views of the court,. the proper resolution of the case is to reverse and remand to the district court for the application of intermediate scrutiny to determine the statute’s constitutionality as applied to Tyler. As we see it, the government may justify § 922(g)(4) in one of two ways: (1) with additional evidence explaining the necessity of § 922(g)(4)’s lifetime ban or (2) with evidence showing that § 922(g)(4) is constitutional as applied to Tyler’because he would be a risk to himself or others were he allowed to possess a firearm.

.' Unlike the federal relief-from-disabilities program, which offered relief to all persons prohibited from gun possession under federal law, the state programs need only provide relief to individuals "who [have] been adjudicated as a mental defective or who [have] been committed to a mental institution.” § 922(g)(4); see Pub. L. No. 110-180 § 105(a)(1).

.The actual number of states with qualifying relief-from-disabilities programs is uncertain. While the government puts the number at thirty-one, the Bureau of Justice Statistics states that as of September 2015, twenty-nine states have enacted qualifying programs. The Bureau also notes that only twenty-two states received NICS Improvement Act funding in 2015. Bureau of Justice Statistics, The NICS Improvement Amendments Act of 2007, http://www.bjs.gov/index.cfm?ty=tp& tid=49#2011 (last visited March 17, 2016).

. We are not aware that Dr. Tyler has any relation to Appellant.

. Tyler's 2012 psychological evaluation notes that records from his hospitalization at Ypsilanti Regional Center are unavailable because the Hospital closed many years ago.

. Tyler stipulated to the dismissal of his claims against the state defendants. They are not party to this appeal.

. "Some courts have treated Hellers listing of 'presumptively lawful regulatory measures,’ for all practical purposes, as a kind of ‘safe harbor,’ ” but "[t]his approach ... approximates rational-basis review, which has been rejected by Heller." Chester I, 628 F.3d at 679; see also United States v. McCane, 573 F,3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring) ("Rather than seriously wrestling with how to apply this new Second Amendment rule, ... courts will continue to simply reference the applicable Heller, dictum and move on.”).

. Two courts of appeals have refused to rely solely on Heller to resolve constitutional challenges to § 922(g)(3), which makes it a crime for habitual drug addicts to possess a gun while they are abusing illegal substances. See Carter I, 669 F.3d at 420; United States v. Yancey, 621 F.3d 681, 684-85 (7th Cir. 2010). Despite the fact that ‘‘[k]eeping guns away from habitual drug users is analogous to disarming felons,” Yancey, 621 F.3d at 684, these courts have subjected § 922(g)(3) to a heightened form of means-end scrutiny. Id., at 683; Carter I, 669 F.3d at 417.

. The Heller Court did not cite § 922(g)(4) or any other provision of § 922(g) for that matter.

. A felony conviction, unlike an adjudication of incompetence or involuntary commitment, “trigger[s] a number of disabilities, many of which impact fundamental constitutional rights." United States v. Barton, 633 F.3d 168, 175 (3d. Cir. 2011) (citing cases where the Supreme Court upheld laws disenfranchising felons and restricting felons' fundamental right to travel).

. Other courts of appeals have had trouble reconciling Heller s "presumptively lawful” language with a two-pronged approach that looks to history and then applies traditional means-end scrutiny. See NRA v. ATF (NRA I), 700 F.3d 185, 196 (5th Cir. 2012) ("It is difficult to discern whether [Heller's exceptions], by virtue of their presumptive validity, either (i) presumptively fail to burden conduct protected by the Second Amendment, or (ii) presumptively trigger and pass constitutional muster under a lenient level of scrutiny.”); Chester I, 628 F.3d at 679 ("It is unclear to us whether Heller was suggesting that longstanding prohibitions’ such as these were historically understood to be valid limitations on the right to bear arms or did not violate the Second Amendment for some other reason.”).

. In his Heller dissent, Justice Breyer concluded that it would be inappropriate to apply strict scrutiny to the majority’s enumerated, presumptively lawful prohibitions:
Respondent proposes that the Court adopt a "strict scrutiny” test, which would require reviewing with care each gun law to determine whether it is "narrowly tailored to achieve a compelling governmental interest.” Abrams v. Johnson, 521 U.S. 74, 82, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997); see Brief for Respondent 54-62. .But the majority implicitly, and appropriately, rejects that suggestion by broadly approving a set of laws — prohibitions on concealed weapons, forfeiture by criminals of the Second Amendment right, prohibitions on firearms in certain locales, and governmental regulation of commercial firearm sales — whose constitutionality under a strict-scrutiny standard would be far from clear.
554 U.S. at 688, 128 S.Ct. 2783 (Breyer, J„ dissenting).

. We do not suggest that strict scrutiny will never be applicable in a Second Amendment challenge to a gun regulation. As the Fourth Circuit noted, "[t]he Second Amendment is no more susceptible to a one-size-fits-all standard of review than any other constitutional right. Gun-control regulations impose varying degrees of burden on Second Amendment rights, and individual assertions of the right will come in many forms.' Chester I, 628 F,3d at 682 (citation omitted).

. Some courts have declined to wade "into the 'levels of scrutiny’ quagmire.” Skoien II, 614 F.3d at 642. Greeno, which necessitates selection of an appropriate level of scrutiny, forecloses this option. 679 F.3d at 518. Nevertheless, even those courts that have avoided the scrutiny morass have adopted inquiries approximating traditional intermediate scrutiny. See, e.g., Booker, 644 F.3d at 25 (requiring "a substantial relationship between the restriction and an important governmental objective"); Yancey, 621 F.3d at 683; Skoien II, 614 F.3d at 641-42 (requiring "some form of strong showing” that the law is "substantially related to an important governmental objective”).

. Judge Sutton would have the Court jettison tiers of scrutiny altogether and adopt an individualized approach to the Second Amend *693 ment instead. While his approach has some logical appeal, we will not strike out on our own analytical path and part ways with nearly all of the circuit courts to analyze gun regulations, including § 922(g), post-Heller.

. After remand and another appeal, the court found that § 922(g)(9) satisfied intermediate scrutiny. The court relied on an intervening case, Staten, 666 F.3d at 166-67, where the government presented evidence showing that "the actual recidivism rate among ‘domestic violence misdemeanants ... is at least 33.3%” and that nearly half of all homicides of females nationally were committed by a domestic partner. United States v. Chester, (Chester II), 514 Fed.Appx. 393, 395 (4th Cir. 2013) (citing Staten, 666 F.3d at 167).

. Seung-Hui Cho was committed less than two years before the tragedy at Virginia Tech. See Brigid Schulte and Chris L. Jenkins, Cho Didn't Get Court-Ordered Treatment, Washington Post, May 7, 2007, http://www. washingtonpost.com/wp-dyn/conten1/article/ 2007/05/06/AR2007050601403.html. Peter Troy was committed less than a year before he shot and killed two people in New,York. See Bruce Lambert, Nassau Agency Lost Track of Suspect Before Killings, N. Y. Times, March 20, 2002, http://www.nytimes.com/2002/03/ 20/nyregion/nassau-agency-lost-track-of-suspect-before-killings.html?ref=topics.

. In its initial brief, the government relied on statistics from the National Institute of Mental Health (“NIMH”) showing that prior suicide attempt is a risk factor for later suicide completion. (See CA6 R. 32, Appellee Br. at 26.) The hyperlink supplied by the govern- . ment does not lead to a webpage supporting this proposition, but other information on the NIMH’s website does explain that a prior suicide attempt is a significant risk factor for suicide. See-Thomas Insel, Director’s Blog, The Under-recognized Public Health Crisis of Suicide, Sept. 10, 2010, http://www.nimh.nih.gov/ about/director/2010/the-under-recognized-public-health-crisis-of-suicide.shtml.

. Here, we should address Tyler's claim, which is echoed in Judge Sutton's concurrence, that "the Second Amendment affords him at least an opportunity to demonstrate he is the safe, sane, stable individual his doctors say he is and to thereby demonstrate that § 922(g)(4) no longer remains constitutional as applied to him.” CA6 R.19, Appellant Br. at 43-44); see also Op at 710-11 (Sutton, J., concurring). This position goes too far. We will not read Heller to require an individualized hearing to determine whether the government has made an improper categorization, and we question the institutional capacity of the courts to engage in such determinations. In Bean, tire Supreme Court addressed whether the federal courts had jurisdiction to review, in the first instance, a relief-from-disability application under § 925(c). 537 U.S. at 72-73, 123 S.Ct. 584. The Court expressed significant doubt about the ability of courts to conduct a de novo review, noting that "[wjhether an applicant is ‘likely to act in a manner dangerous to public safety' presupposes an inquiry into that applicant's background — a function best performed by the Executive, which, unlike courts, is institutionally equipped for conducting a neutral, wide-ranging investigation.” Id. at 77, 123 S.Ct, 584. Further, the Court noted that "the 'public interest’ standard calls for an inherently policy-based decision best left in the hands of an agency.” Id.-, see also Mullís, 230 F.3d at 219 (noting that "[w]hile district courts are well equipped to make credibility judgments and factual determinations, they are without the tool's necessary to conduct a systematic inquiry into an applicant's background”). Given these doubts, we feel it unwise to reject traditional tiers of scrutiny analysis in favor of individualized determinations.
That said, providing Tyler a hearing is certainly one option the government has at its disposal, assuming Congress is willing to appropriate money to the Executive for such determinations. But it is not required to justify the statutory scheme under intermediate scrutiny — although, we imagine that if Congress were to fund the review provision emr bodied in 18 U.S.C. § 925(c), it would likely render § 922(g)(4) constitutional under any form of scrutiny. Likewise, on remand, the *699 government may, if it chooses, attempt to prove that § 922(g)(4) is constitutional as applied to Tyler because he is not the peaceable, healthy, and responsible citizen he claims to be in his complaint.