**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DUY T. MAI,

*Plaintiff-Appellant*,

v.

UNITED STATES OF AMERICA;
UNITED STATES DEPARTMENT OF
JUSTICE; BUREAU OF ALCOHOL,
TOBACCO, FIREARMS, AND
EXPLOSIVES; FEDERAL BUREAU OF
INVESTIGATION; WILLIAM P. BARR,
Attorney General; CHRISTOPHER A.
WRAY, as Director of the Federal
Bureau of Investigation; REGINA
LOMBARDO, as Acting Director of
the Bureau of Alcohol, Tobacco,
Firearms, and Explosives,

*Defendants-Appellees.*

No. 18-36071

D.C. No.
2:17-cv-00561-
RAJ

ORDER

Filed September 10, 2020

Before: Susan P. Graber and Ronald M. Gould, Circuit
Judges, and David A. Ezra,* District Judge.

---

*The Honorable David A. Ezra, United States District Judge for the
District of Hawaii, sitting by designation.

Order;
Dissent by Judge Collins;
Dissent by Judge Bumatay;
Dissent by Judge VanDyke

## SUMMARY[**]

### Second Amendment

The panel denied a petition for panel rehearing and denied on behalf of the court a petition for rehearing en banc. In the underlying appeal, the panel affirmed the district court's dismissal of a 42 U.S.C. § 1983 complaint containing an as-applied Second Amendment challenge to 18 U.S.C. § 922(g)(4), which prohibits plaintiff from possessing firearms due to his involuntary commitment in 1999 to a mental institution for more than nine months after a Washington state court found plaintiff to be both mentally ill and dangerous. The panel concluded that Section 922(g)(4)'s continued application to plaintiff did not violate the Second Amendment.

Dissenting from the denial of rehearing en banc, Judge Collins stated that the panel's application of intermediate scrutiny here was seriously flawed and created a direct split with the Sixth Circuit. That alone was enough to warrant en banc review, and Judge Collins therefore joined Part IV.B of Judge Bumatay's dissent from the denial of rehearing en banc. Moreover, Judge Collins stated that he had substantial doubt that the framework of rules that the court uses to

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

analyze Second Amendment claims properly construes the controlling principles set forth in *District of Columbia v. Heller*, 554 U.S. 570 (2008).

Dissenting from the denial of rehearing en banc, Judge Bumatay, joined by Judges VanDyke, and with whom judges Ikuta, Bade, and Hunsaker join as to Part IV, and with whom Judges Bennett, Collins, and Bress join as to Part IV.B, stated that the panel's opinion justified the disturbing deprivation of a fundamental right by ignoring the history and tradition of the Second Amendment and applying ill-suited, foreign statistical studies that had no bearing on plaintiff's circumstances. The proper inquiry would have recognized that the lifetime ban imposed by § 922(g)(4) on plaintiff is unequivocally a complete deprivation of his core right to home gun ownership, and therefore that the law was unconstitutional. Judge Bumatay stated that the panel incorrectly identified intermediate scrutiny as the proper standard of review and then flubbed its application. By failing to correct these errors, the Court undermined its Second Amendment jurisprudence and gave an unworthy judicial imprimatur to the false premise that once mentally ill, always mentally ill.

Dissenting from the denial of rehearing en banc, Judge VanDyke, joined by Judge Bumatay, stated that he agreed with Judge Bumatay's dissent from the denial of rehearing en banc and wrote separately because he believes that the panel should have reconsidered the panel's circular logic about *who* lies at the core of the Second Amendment. Judge VanDyke stated that the panel's bootstrapping, class-based approach to defining those at the "core" of the Second Amendment was unjust and antithetical to controlling case law. Judge VanDyke also stated that the court's intermediate

scrutiny jurisprudence is broken, at least as to Second Amendment claims.

## COUNSEL

Vitaliy Kertchen (argued), Tacoma, Washington, for Plaintiff-Appellant.

Abby C. Wright (argued) and Michael S. Raab, Appellate Staff; Brian T. Moran, United States Attorney; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

## ORDER

The panel judges have voted to deny Appellant's petition for rehearing. Judges Graber and Gould voted to deny the petition for rehearing en banc, and Judge Ezra recommended denying the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc. A judge of the court requested a vote on en banc rehearing. The matter failed to receive a majority of votes of non-recused active judges in favor of en banc consideration. Fed. R. App. P. 35.

Appellant's petition for rehearing and petition for rehearing en banc, filed Docket No. 37, are **DENIED**.

COLLINS, Circuit Judge, dissenting from the denial of rehearing en banc:

As Judge Bumatay ably explains in Part IV(B) of his dissent, the panel's application of intermediate scrutiny here is seriously flawed and creates a direct split with the Sixth Circuit. That alone is enough to warrant en banc review, and I therefore join that section of Judge Bumatay's dissent. Moreover, I have substantial doubt that the framework of rules that this court uses to analyze Second Amendment claims properly construes the controlling principles set forth in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and granting en banc review in this case would have given us a welcome opportunity to reexamine that framework. I respectfully dissent from our failure to rehear this case en banc.

---

BUMATAY, Circuit Judge, with whom VANDYKE, Circuit Judge, joins, with whom IKUTA, BADE, and HUNSAKER, Circuit Judges, join as to Part IV, and with whom BENNETT, COLLINS, and BRESS, Circuit Judges, join as to Part IV.B, dissenting from the denial of rehearing en banc:

Today, our court advances an extraordinarily sweeping view of government power. Against the text, history, and tradition of the Second Amendment, we hold that the government may forever deprive a person of the individual right to bear arms—if that person spends even *one day* committed involuntarily, even as a *juvenile,* and no matter the person's current mental health soundness. Of course, we only adopt this view for the Second Amendment. For other, more fashionable constitutional rights, we would not countenance such an abridgment.

When the Second Amendment was ratified, times were different. Firearms were ubiquitous and their regulation was sparse. Firearms were considered essential for defense of the home and hearth. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). While times have changed, the Constitution has not. The Second Amendment is not "a second-class right," *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 780 (2010), so we must continue to uphold the right it confers against government encroachment. But by aggrandizing the government's power here, we improperly relegate the Second Amendment to "disfavored right" status yet again. *Silvester v. Becerra*, 138 S. Ct. 945 (2018) (Thomas, J., dissenting from denial of certiorari).

In doing so, we seemingly treat some people as second-class citizens—concluding that they don't deserve the full complement of fundamental rights. We don't make that decision based on any present-day impairments or past criminal convictions, but, in the case of Duy Mai, for an involuntary commitment to a mental-health facility more than 20 years ago when he was just 17 years old. Because of that brief commitment as a teen, our court lets the federal government ban Mai—for *life*—from possessing a firearm. This, despite a state court finding that Mai is no longer mentally ill or dangerous. We justify this disturbing deprivation of a fundamental right by ignoring the history and tradition of the Second Amendment and applying ill-suited, foreign statistical studies that have no bearing on Mai's circumstances. By failing to correct our errors here, we undermine our Second Amendment jurisprudence and give an unworthy judicial imprimatur to the false premise that "once mentally ill, always mentally ill."

I respectfully dissent from the denial of rehearing en banc.

## I.

By all accounts, Duy Mai is an American success story. Mai was born in a Thai refugee camp to a Vietnamese family and moved to the United States at the age of two. As so many immigrants have, Mai has flourished in this country.

Overcoming an early language barrier, Mai carved out a stellar academic and professional career. After starting at a community college, Mai graduated from the University of Washington with a 3.7 GPA and a degree in microbiology. While at the University of Washington, Mai's studies were inspired by a desire to help people living with HIV and, in his spare time, Mai volunteered for environmental and humanitarian causes. Post-graduation, Mai enrolled at the University of Southern California, where he focused on cancer research and received a master's in microbiology. After returning to Washington state, Mai started a job at the Benaroya Research Institute, concentrating on virology. As part of his job, he passed an FBI background check allowing him access to an irradiator. Today, Mai works as an immune monitoring specialist at the Seattle-based Fred Hutchinson Cancer Research Center.

Mai is similarly enriched in his home life. While at USC, Mai met a woman and they now raise eight-year-old twins. He remains close to his sister and parents and often meets them for weekend family dinners. He also enjoys wilderness activities and volunteer work.

Mai has been a productive member of society for nearly 20 years. But like most people, Mai has faced his share of challenges. At the age of 17, he suffered from depression, for which he was involuntarily committed to a mental health hospital for a little over two months total after a Washington state court determined that he might be a harm to others. But

since Mai's commitment order expired in August 2000, he has not been re-committed and his medical record shows no reoccurrence of serious mental illness. He has no criminal history or substance abuse issues.

Under state and federal law, Mai was barred from possessing a firearm due to his involuntary commitment. In 2014, Mai successfully petitioned the State of Washington to remove the state-law barrier. *See* Wash. Rev. Code § 9.41.047(3)(c)(iii). Mai submitted his medical history showing that he's been free of depression since at least 2010 and that, based on the opinions of multiple psychologists, he is not considered a significant risk of suicide or harm to others. Based on this evidence and declarations from his friends and family, the Washington court agreed that Mai doesn't present a substantial danger to himself or to the public and that the symptoms that led to his commitment are not reasonably likely to reoccur. Thus, today, under state law, Mai's right to possess a firearm has been fully restored.

Mai's final hurdle is federal law. It prohibits an individual who has been "committed to a mental institution" from possessing a firearm. 18 U.S.C. § 922(g)(4). Mai brought an as-applied challenge to § 922(g)(4) and sought declaratory and injunctive relief declaring him eligible to possess a firearm under federal law and the Constitution. The district court granted the government's motion to dismiss. *Mai v. United States*, No. C17-0561 RAJ, 2018 WL 784582, at *6 (W.D. Wash. Feb. 8, 2018). Applying intermediate scrutiny, the district court rejected Mai's claim based on various studies linking mental illness to a heightened risk of gun violence. *Id.*

On appeal, this court affirmed. Without bothering itself with the text, history, or tradition of the Second Amendment, the court decided that, due to Mai's brief commitment, he

was not a "law-abiding, responsible" citizen and, therefore, not protected by the Second Amendment's "core." *See Mai v. United States*, 952 F.3d 1106, 1115 (9th Cir. 2020). In so ruling, the court compared Mai's past commitment to a conviction for domestic violence. *Id.* The court also concluded that Washington's adjudication of his mental soundness and subsequent restoration of his gun rights—and Mai's present-day mental health status—were irrelevant to the constitutional analysis. *Id.* at 1115, 1120. Finally, with the help of studies from Sweden, Australia, Italy, and other countries, the court ruled that the permanent deprivation of Mai's fundamental right cleared intermediate scrutiny. *Id.* at 1118–20. We should've corrected the layers of errors in this decision through en banc review.

## II.

The Second Amendment guarantees that, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "[O]n the basis of both text and history," the Second Amendment confers "an individual right to keep and bear arms." *Heller*, 554 U.S. at 595. This guarantee was considered "among those fundamental rights necessary to our system of ordered liberty." *McDonald*, 561 U.S. at 778.

Of course, this right is not without its limits. It does not guarantee a right to keep and carry "any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. The Court noted, for example, that nothing in *Heller* should "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* But it recognized that there would be time to "expound upon the historical justifications for the exceptions . . . if and when those exceptions come

before" the Court. *Id.* at 635. *Heller*, in the meantime, observed that these "longstanding" prohibitions were "presumptively lawful regulatory measures." *Id.* at 627 n.26.

*Heller* provided us the roadmap for Second Amendment claims. The Court looked to the Amendment's words, Founding-era thinkers, and early court decisions to examine the scope of the Second Amendment right. *Heller*, thus, showed us exactly what to look at: the text, history, and tradition. *Id.* at 605, 625, 635. Importantly, the Court warned that the Second Amendment was not subject to a "freestanding 'interest-balancing' approach." *Id.* at 634. The Court observed that the "very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id*. Accordingly, *Heller* squarely rejected the view that "the scope of the Second Amendment right should be determined by judicial interest balancing." *McDonald*, 561 U.S. at 785.

Yet judicial interest balancing is exactly what our court does. Following *Heller*, our circuit, like many others, adopted a two-step test to adjudicate Second Amendment claims. First, we ask whether the statute at issue "burdens conduct protected by the Second Amendment[.]" *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013). We decide this "based on a 'historical understanding of the scope of the [Second Amendment] right[.]'" *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014) (quoting *Heller*, 554 U.S. at 625). Second, having determined that the law burdens protected Second Amendment activity, we select the appropriate level of scrutiny based on our assessment of "(1) how close the law comes to the core of the Second Amendment right and

(2) the severity of the law's burden on the right." *Chovan*, 735 F.3d at 1138 (simplified).

Judges across this country have questioned whether *Chovan*-type tests are consistent with *Heller*'s command to follow the text, history, and tradition in evaluating the scope of the Second Amendment. *See, e.g.*, *United States v. McGinnis*, 956 F.3d 747, 762 (5th Cir. 2020) (Duncan, J., concurring) (encouraging the replacement of the Fifth Circuit's two-step test in favor of *Heller*'s text and history mandate); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 127 (3d Cir. 2018) (Bibas, J., dissenting) (arguing that *Heller* did not set up tiers of scrutiny with respect to regulations affecting the Second Amendment); *Mance v. Sessions*, 896 F.3d 390, 398 (5th Cir. 2018) (Ho, J., dissenting) (explaining that *Heller* instructs that fundamental constitutional rights are enshrined with the scope they were understood to have at the Founding); *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 702 (6th Cir. 2016) (Batchelder, J., concurring) (encouraging the replacement of the Sixth Circuit's two-step test in favor of a test that, as required by *Heller* and *McDonald*, looks to history and tradition); *id.* at 710 (Sutton, J., concurring) (arguing that history and tradition should inform the scope of the Second Amendment rather than tiers of scrutiny); *Ezell v. City of Chicago*, 651 F.3d 684, 701–02 (7th Cir. 2011) (Sykes, J.) (explaining that the scope of the Second Amendment right requires a historical inquiry into original meaning and does not leave room for interest-balancing); *Heller v. District of Columbia*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."); *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New*

*York*, 140 S. Ct. 1525, 1544 (2020) (Alito, J., dissenting) ("We are told that the mode of review in this case is representative of the way *Heller* has been treated in the lower courts. If that is true, there is cause for concern.").

Indeed, when this court first adopted the two-step test, Judge Bea rightfully questioned whether applying tiers of scrutiny to a Second Amendment right was consistent with *Heller*. *Chovan*, 735 F.3d at 1143 (Bea, J., concurring). As Judge Bea noted, "[u]nitary tests such as strict scrutiny, intermediate scrutiny, undue burden, and the like don't make sense . . . in the Second Amendment context because the language of *Heller* seems to foreclose scrutiny analysis." *Id.* (quoting Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1443, 1461–73 (2009)) (simplified). Nevertheless, since *Chovan* didn't challenge the application of an interest-balancing test, Judge Bea considered the question waived. *Id.*

I share these concerns. It is difficult to square the type of means-ends weighing of a government regulation inherent in the tiers-of-scrutiny analysis with *Heller*'s directive that a core constitutional protection should not be subjected to a "freestanding 'interest-balancing' approach." *Heller*, 554 U.S. at 634. In fact, such an analysis is difficult to square with the interpretation of most constitutional rights. As Justice Scalia wrote, "[a] constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Id.* After all, "[t]he People, through ratification, have already weighed the policy tradeoffs that constitutional rights entail." *Luis v. United States*, 136 S. Ct. 1083, 1101 (2016) (Thomas, J., concurring). Our duty as unelected and unaccountable judges is to defer to the view of the people who ratified the

Second Amendment, which is itself the "very *product* of an interest balancing by the people." *Heller*, 554 U.S. at 635. By ignoring the balance already struck by the people, and instead subjecting enumerated rights, like the Second Amendment, to our own judicial balancing, "we do violence to the [constitutional] design." *Crawford v. Washington*, 541 U.S. 36, 67–68 (2004). Perhaps, this is why "[t]he Constitution does not prescribe tiers of scrutiny." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2327 (2016) (Thomas, J., dissenting).

If operating on a clean slate, I would hew to *Heller*'s and *McDonald*'s fidelity to the Second Amendment's history, tradition, and text. The precise contours of such a review should be subject to further refinement; but we might, as Justice Scalia suggested in *Heller* itself, look to the original meaning of the First Amendment. *See Heller*, 554 U.S. at 635 (suggesting categorical exceptions to the First Amendment as recognized at the Founding, such as obscenity, libel, and disclosure of state secrets); *see also Tyler*, 837 F.3d at 712 (Sutton, J., concurring) (opining that "*Heller* creates an on-off switch to the right to bear arms"). Under this view, a law may only constitutionally prohibit the core right to keep arms in the home for self-defense if the prohibition falls within an exception understood to be outside of the Amendment's scope at the time of the Founding.

As the following section shows, when viewed under the original understanding of the Second Amendment, § 922(g)(4)'s application to Mai cannot pass muster.

### III.

In the Founding era, little regulation surrounded the core right of gun ownership for self-defense of the home. As

recognized by *Heller*, the Founders understood the "[t]he right of self defence" as "the first law of nature" and "the true palladium of liberty[.]" *Heller*, 554 U.S. at 606 (quoting 1 St. George Tucker, *Blackstone's Commentaries* 300 (1803)). William Rawle, a constitutional scholar and George Washington's pick for Attorney General, noted that "[n]o clause in the Constitution could by any rule of construction be conceived to give to congress a power to disarm the people. . . . But if in any blind pursuit of inordinate power, [congress] should attempt it, [the Second] amendment may be appealed to[.]"     William Rawle, *A View of the Constitution of the United States* 125–26 (2d. ed 1829). When proposing a model constitution for Virginia in 1776, Jefferson included within the document the explicit guarantee that "[n]o free man shall be debarred the use of arms in his own lands." *The Jefferson Cyclopedia* 51 (Foley ed., reissued 1967).

Historical regulations of the right to bear arms focused more on how people *used* weapons—not who could own them. For example, in 1840, the Alabama Supreme Court upheld a ban on the secret carrying of guns and knives. *State v. Reid*, 1 Ala. 612, 614–15, 622 (1840); *see also Aymette v. State*, 21 Tenn. 154 (1840) (upholding a statute making the carrying of a concealed weapon a crime); *State v. Chandler*, 5 La. Ann. 489, 489–90 (1850) (same). In 1846, the Supreme Court of Georgia noted that at the time of the Founding there was a distinction between "a law prohibiting the exercise of the right [to bear arms], and a law merely regulating the manner of exercising that right." *Nunn v. State*, 1 Ga. 243, 247 (1846). Consequently, a state legislature could ban the concealed-carry of a gun, so long as the ban did not infringe upon the "*natural* right of self-defence, or of [the] constitutional right to keep and bear arms." *Id.* at 251.

Indeed, the first decision addressing a firearms regulation based on the *condition* of a person (rather than the manner of carrying) did not arise until 1886.  *See* C. Kevin Marshall*, Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 711 (2009) (citing *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886)) (hereinafter, "*Martha*").   In *Shelby*, the Supreme Court of Missouri upheld a restriction on the carrying of a deadly weapon while intoxicated.  2 S.W. at 469.  Similarly, late 19th century laws in Michigan and the District of Columbia restricted weapons ownership for minors.  *See Martha* at 712 n.93.  But as a Texas state court explained, the state may have "the power by law to regulate the wearing of arms, with a view to prevent crime, but it has not the power to enact a law the violation of which will work a forfeiture of defendant's arms."  *Jennings v. State*, 5 Tex. Ct. App. 298, 300 (1878) (striking down a law requiring forfeiture of guns used during a crime under the state constitution).

It should come as no surprise, then, that scholars have "search[ed] in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership."  Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009). Such laws would be highly unusual in a context where regulations focused on use rather than ownership.  Not until 1930 do we see laws specifically touching on gun ownership and mental health, after the ABA-approved Uniform Firearms Act prohibited delivery of a pistol to any person of "unsound" mind.  *Id.* at 1376 (quoting *Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings of the Fortieth Annual Conference* 563 (1930)).   The Act, first drafted in 1926, sought to promote uniform state laws on firearms.  Legislation, *The*

*Uniform Firearms Act*, 18 Va. L. Rev. 904, 904–05 (1932).
It was adopted by Pennsylvania in 1931, *id.* at 905 n.9, and
other states passed similar laws in the following decades,
*see, e.g.*, 1965 N.Y. Laws 2343, 2472 (codified at N.Y. Penal
Law §400.00.1 (McKinney 2008)).  The statute at issue here,
§ 922(g)(4), was not enacted until 1968.  Gun Control Act of
1968, Pub. L. No. 90-618, 82 Stat. 1213, 1220.

Given the paucity of Founding-era laws specifically
prohibiting gun ownership by the mentally ill, we are better
served by exploring the dominant thinking on mental illness
in that period.  On this, the evidence is clear: temporary
mental illness didn't lead to a permanent deprivation of
rights.

Influential philosophers of the day understood that rights
attach with the attainment of "reason" and, correspondingly,
the loss of rights persisted only through the loss of reason.
*See Tyler*, 837 F.3d at 705–06 (Batchelder, J., concurring)
(citing 1 Jean-Jacques Burlamaqui, *The Principles of
Natural and Politic Law* 82 (1747); John Locke, *Two
Treatises of Government* (1691), *reprinted in* 4 John Locke,
*The Works of John Locke* 207, 339, 342 (12th ed. 1824);
1 Frederick Pollock & Frederic William Maitland, *The
History of English Law Before the Time of Edward I* 507–08
(1898)).  This understanding accorded with a deeply rooted
common law tradition recognizing that mental illness was
not a permanent condition.  *See id.* at 707–14 (Sutton, J.,
concurring) (citing 1 William Blackstone, *Commentaries*
*304–05; Anthony Highmore, *A Treatise on the Law of
Idiocy and Lunacy* 104 (1807)).[1]  Thus, an "insane" person

---

[1] For example, in 1689, a Virginia court ordered the confinement of
John Stock, who kept "running about the neighborhood day and night in
sad Distracted Condition to the great Disturbance of the people" to

was one who "by disease, grief, or other accident hath lost the use of his reason." 1 William Blackstone, *Commentaries* \*304. But "the law always imagines, that the[] accidental misfortunes [that caused the lunacy] may be removed" and at that point the person's rights restored. *Id.* at \*304–05; *see* 1 Frederick Pollock & Frederic William Maitland, *The History of English Law Before the Time of Edward I* 507–08 (1898); *see also* Anthony Highmore, *A Treatise on the Law of Idiocy and Lunacy* 73 (1807) ("[A] lunatic [was] never to be looked upon as irrecoverable.").

These views on the mentally ill were reflected in historical practices and laws. Even as Virginia sought to ratify its constitution with a limitation on the civil rights of "lunatics," such limitation was only "during their state of insanity." 1 St. George Tucker, *Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia* 145 (1803). Virginia recognized that "an[c]ient law" mandated that the insane should recover their rights when "they recovered their senses." *Id.* For example, even if a former "lunatic[]" had his property taken, he was free to petition a tribunal to establish that "he was now restored to his Understanding" in order to re-claim the property. Charles Viner, *A General Abridgment of Law and Equity* 138 (1741). And while judicial officials were authorized to "lock up" "lunatics" or "other individuals with dangerous mental impairments" (thereby depriving them of all rights), they were "locked up only so long as such lunacy or disorder shall continue, and no longer." Henry Care, *English Liberties, or the Free- born*

---

prevent "his doeing any further Mischiefe." Gerald N. Grob, *Mad Among Us* 16 (1994). But Stock was to be confined only "until hee bee in a better condition to Governe himself." *Id.*

*Subject's Inheritance* 329 (6th ed. 1774). Similarly, the statute of limitations affecting a claimed property right would not run against a mentally ill person until the "removal of his disability and knowledge of the existence of" such right. *See Dicken v. Johnson*, 7 Ga. 484, 494 (1849).

From this historical record a clear picture emerges: mental illness was considered a *temporary* ailment that only justified a *temporary* deprivation of rights. At the time of the Founding, the idea that the formerly mentally ill were permanently deprived of full standing in the community was nowhere to be found. Thus, § 922(g)(4)'s permanent prohibition on those "formerly committed to a mental institution" patently burdens the Second Amendment right of an individual, like Mai, who has been adjudicated to be no longer mentally ill and whose commitment was long ago.

*Heller*'s observations about "presumptively lawful regulatory measures" does not change this analysis. *See United States v. Torres*, 911 F.3d 1253, 1262 (9th Cir. 2019). *Heller*'s reference to firearm prohibitions for the "mentally ill" as being "presumptively lawful," 554 U.S. at 626, 627 n.26, apply to those who are *presently* mentally ill. "[A] good rule of thumb for reading [Court] decisions is that what they say and what they mean are one and the same." *Mathis v. United States*, 136 S. Ct. 2243, 2254 (2016). As such, we view these categories as "well-defined and narrowly limited." *Jackson*, 746 F.3d at 960 (quoting *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 791 (2011)). Accordingly, nothing in these categories contravenes the historical evidence that mental illness was considered a *temporary* status with no lifelong legal consequences. Because Mai is

not currently mentally ill, he doesn't belong in that "presumptive" category.[2]

With no historical support for this type of permanent restriction, or even an analogous restriction, § 922(g)(4) as applied to Mai violates the Second Amendment's command that "the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  Accordingly, we should have said as much and reversed the district court's decision.

## IV.

As I have shown, § 922(g)(4)'s application to Mai has no basis in the text, tradition, and history of the Second Amendment.  But until our court agrees to apply such a test to Second Amendment claims under en banc review or the Court provides us with further guidance, we remain bound by the *Chovan* test.  But even under that test, the court *still* got it wrong.    The court first incorrectly identified intermediate scrutiny as the proper standard of review and then flubbed its application.    These errors were further reason to revisit this case.

## A.

As discussed, *Chovan* calls for a two-step process.  First, we determine if the law "burdens conduct protected by the Second Amendment," *Chovan*, 735 F.3d at 1136, "based on a historical understanding of the scope of the [Second

---

[2] As the Sixth Circuit held, "*Heller*'s presumption of lawfulness should not be used to enshrine a permanent stigma on anyone who has ever been committed to a mental institution for whatever reason." *Tyler*, 837 F.3d at 688.  To do so "would amount to a judicial endorsement of Congress's power to declare, 'Once mentally ill, always so.'" *Id.*

Amendment] right[.]" *Jackson*, 746 F.3d at 960 (9th Cir. 2014) (simplified). Second, we decide what level of scrutiny applies based on our assessment of "(1) how close the law comes to the core of the Second Amendment right and (2) the severity of the law's burden on the right." *Chovan*, 735 F.3d at 1138 (simplified). Depending on the answers to these questions, we determine our review on a sliding scale ranging from intermediate scrutiny to per se unconstitutionality. *See Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016). A law, like the complete handgun ban examined in *Heller*, that imposes "such a severe restriction" on the core Second Amendment right that "it amounts to a destruction of [that] right" is per se unconstitutional. *See Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017) (simplified). A "law that implicates the core of the Second Amendment right and severely burdens that right"—without totally destroying it, like a ban on large-capacity magazines—"warrants strict scrutiny." *Duncan v. Becerra*, No. 19-55376, 2020 WL 4730668, at \*22 (9th Cir. Aug. 14, 2020) (quoting *Silvester*, 843 F.3d at 821, 827). For all other laws that do not implicate the core Second Amendment right or do not substantially burden that right, like a short waiting period to purchase firearms, we apply intermediate scrutiny. *Torres*, 911 F.3d at 1262 (citing *Jackson*, 746 F.3d at 961); *Silvester*, 843 F.3d at 823.

The court erred at both steps of the *Chovan* analysis. At step one, the court assumed, rather than decided, that § 922(g)(4) as applied to Mai burdens conduct protected by the Second Amendment right. *Mai*, 952 F.3d at 1114. But by dodging the question of "which perspective better comports with the historical evidence," *id.*, the court sidesteps *Heller*'s command to review the text, history, and tradition of the Amendment. *Heller*, 554 U.S. at 605, 625, 635. But when we suspect that a question may implicate a

"core" constitutional concern, "we should do more before tossing it aside." *Fazaga v. FBI*, 965 F.3d 1015, 1079 (9th Cir. 2020) (Bumatay, J., dissenting). Furthermore, when undertaking a constitutional analysis, "[w]e should resolve questions about the scope of [our] precedents in light of and in the direction of the constitutional text and constitutional history." *Edmo v. Corizon, Inc.*, 949 F.3d 489, 506 (9th Cir. 2020) (Bumatay, J., dissenting) (quoting *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 537 F.3d 667, 698 (D.C. Cir. 2008) (Kavanaugh, J., dissenting)).

By punting the analysis of the historical scope of the Second Amendment and its impact on the formerly mentally ill, we let false assumptions cloud our judgment and distort our precedent even further from the original understanding of the Constitution. Had we done the requisite analysis, we would have recognized that this law not only burdens Second Amendment-protected conduct, but that it also strikes at the core right protected by its guarantee. Instead, our court skips this important step—an omission that infects the rest of the *Chovan* analysis.

The court erred again at *Chovan* step two, by incorrectly identifying intermediate scrutiny as the proper standard.[3] As we have recently explained, step two of *Chovan* "is a simple inquiry: if a law regulating arms adversely affects a law-abiding citizen's right of defense of hearth and home, that law strikes at the core Second Amendment right." *Duncan*, 2020 WL 4730668, at \*12; *Jackson*, 746 F.3d at 961

---

[3] Without reference to our precedent, Mai apparently agreed that intermediate scrutiny should apply to his case. *See Mai*, 952 F.3d at 1115. Nevertheless, "we are not bound to decide a matter of constitutional law based on a concession." *Colo. Republican Fed. Campaign Comm. v. Fed. Election Comm'n*, 518 U.S. 604, 622 (1996).

(recognizing that laws which regulate only the "manner in which persons may exercise their Second Amendment rights" are less burdensome than those which "bar firearm possession completely") (quoting *Chovan*, 735 F.3d at 1138); *see also Heller*, 554 U.S. at 635 ("[W]hatever else it leaves to future evaluation, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.").

Under this framework, the application of § 922(g)(4) to Mai strikes at the core Second Amendment right—and guts it. Indeed, § 922(g)(4) completely deprives Mai of the ability to possess a firearm, even within the home, where protections are "at their zenith." *Duncan*, 2020 WL 4730668, at \*12 (quoting *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012)). In any other context, laws that burden the core of a fundamental right are invariably analyzed under heightened scrutiny—e.g., restrictions on the "content" of speech rarely survive strict scrutiny, *e.g.*, *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011), nor do laws that restrict "core" political speech, *see, e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995); *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 207 (1999) (Thomas, J., concurring). We should not treat the Second Amendment any different. Instead, we should have recognized that § 922(g)(4) effects a complete deprivation of Mai's core Second Amendment right and held the law unconstitutional as applied to him.

At a minimum, the law is a "substantial burden" on the core Second Amendment right, warranting the application of strict scrutiny. *Duncan*, 2020 WL 4730668, at \*22. But the court evaded any form of strict scrutiny, despite admitting that § 922(g)(4)'s "lifetime ban" on Mai's Second

Amendment right was "quite substantial," by minimizing the law's burden as falling on only a "narrow class" of individuals. *Mai*, 952 F.3d at 1115. In doing so, the court seemingly pulls new doctrine out of its hat and magically transforms a fundamental right that belongs to an individual, *Heller*, 554 U.S. at 592, into one that is class-based. Rather than face the total and permanent deprivation of the core Second Amendment right for Mai (and the class of people like him), the court refocused the inquiry on the *size* of the class. And ta-da!, the court holds, intermediate scrutiny applies. Like most magicians, the court refused to explain its act.[4] Because the law deprives only a "narrow class" of individuals their Second Amendment right, ipse dixit, it is analyzed only under intermediate scrutiny. Such reasoning is even more perplexing given that heightened scrutiny was originally announced as a method to protect the rights of "discrete and insular minorities." *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938). Today, according to the court, the fact that Mai belongs to a "narrow class" is, paradoxically, *the very reason* to lower the level of scrutiny applied to him. We should have corrected this jurisprudential sleight of hand.

Next, the court justified its decision to apply intermediate scrutiny by refusing to recognize Mai as a "law-abiding, responsible citizen." But its refusal to do so is baffling. Besides a brief involuntary commitment as a youth, nothing in the record shows that Mai is anything but

---

[4] The court cites to *Tyler* for its analysis, *Mai*, 952 F.3d at 1115, but *Tyler* provides no reasoning for the class-based burden approach and only cites to a Tenth Circuit case for that proposition. *Tyler*, 837 F.3d at 691 (citing *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010)). In turn, the Tenth Circuit case merely announces the proposition with no accompanying analysis. *Reese*, 627 F.3d at 792. So the court falls into a rabbit hole within rabbit holes to justify its conclusion.

a "law-abiding, responsible citizen." Instead, it shows that Mai is a person of advanced education and demonstrated professional achievement, with strong community and family support and no history of criminal activity or substance abuse. Yes, he suffered from significant depression as a teen, but recent psychological evaluators and Washington state have concluded he is not currently mentally ill and presents no risk of violence to others or himself. Nor is that reasonably likely to change in the future. Washington, in turn, restored his right to possess firearms under state law.

But this court decided it knows better, holding that, "[r]egardless of [Mai's] present-day peaceableness," Mai is *not* a "law-abiding, responsible citizen" because of his brief commitment 20 years ago. *Mai*, 952 F.3d at 1115. The court, with no analysis, held that "[t]he same logic" used to prohibit a domestic-violence convict from possessing a firearm applied here—to a person like Mai. *Id.* (citing *Chovan*, 735 F.3d at 1138).[5] But a criminal conviction is not the same as mental illness. Unless pardoned, expunged, or set aside, a conviction always remains a conviction under the law. *See, e.g.*, 18 U.S.C. § 921(a)(20)(B), (33)(B)(ii). And,

_____

[5] In *Chovan*, we found § 922(g)(9)'s prohibition on firearm possession by domestic-violence misdemeanants didn't implicate the "core" Second Amendment protection because the law's burden fell only on "individuals with criminal convictions." *Chovan*, F.3d at 1138. The court doesn't justify why mental illness fits into the same category. Indeed, while civil commitment often results from threats of physical harm, some states allow civil commitment where no risk of physical harm is present at all. *See, e.g.*, Haw. Rev. Stat. § 334-1 ("substantial" emotional injury on others); Iowa Code § 229.1(20) ("serious" emotional injury on others); Kan. Stat. Ann. § 59-2946(f)(1)–(3) (property damage); La. Stat. Ann. §§ 28:55(E)(1), 28:2(10) (substance abuse); N.H. Rev. Stat. Ann. §§ 135-C:34, 135-C:2(X) (noncontinuous alcohol abuse).

at least for felony convictions, there is historical support for a law resulting in forfeiture of property and rights. *See* 2 William Blackstone, *Commentaries* \*377 (describing the possible punishments of serious crime as including "confiscation, by forfeiture of lands, or moveables, or both, or of the profits of lands for life: others induce a disability, of holding offices or employments, being heirs, executors, and the like"); *see also United States v. McCane*, 573 F.3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring) ("[T]he application of § 922(g) to a violent felon . . . would appear appropriate under any Second Amendment reading. After all, felons lose out on fundamental rights such as voting and serving on juries, and face discrimination that need only survive rational basis review."). As we have said, "felons are categorically different from the individuals who have a fundamental right to bear arms." *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010).

So, while the law may hold that "once a convict, always a convict," tradition, history, and elementary psychology teach us that "once mentally ill, *not* always mentally ill." This is the distinction that the court ignores. Indeed, under the court's extreme reading of the law, any person falls outside of the Constitution's core protection if that person spends even *one day* in commitment—even as a youth! Nothing in the text, history, and tradition of Constitution supports this view. The proper inquiry would have recognized that the lifetime ban imposed by § 922(g)(4) on Mai is unequivocally a complete deprivation of his core right to home gun ownership. As such, the law is unconstitutional.

## B.

Even accepting the court's error and analyzing Mai's claim under intermediate scrutiny, we still got it wrong.

To satisfy intermediate scrutiny, the government's statutory objective must be "significant, substantial, or important," and there must be a "reasonable fit" between the challenged law and that objective. *Mai*, 952 F.3d at 1115 (quoting *Silvester*, 843 F.3d at 821–22).[6] The burden of satisfying intermediate scrutiny is demanding and rests entirely on the government. *United States v. Virginia*, 518 U.S. 515, 533 (1996). It doesn't require the court to approve "shoddy data or reasoning." *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002). We demand "consistency and substantiality" in the evidence the government uses to establish a sufficient fit between its means and ends. *Lalli v. Lalli*, 439 U.S. 259, 274 (1978) (quoting *Mathews v. Lucas*, 427 U.S. 495, 515 (1976)). The proffer of "loose-fitting generalities" in the form of statistical data is insufficient to clear intermediate scrutiny. *See Craig v. Boren*, 429 U.S. 190, 191–92, 202–04, 209 (1976) (rejecting to the use of "broad sociological propositions" to particularized applications under heightened scrutiny).

Here, the court disclaims any adherence to the false assumption that "once mentally ill, always mentally ill." The court also fully professes to believe in Mai's current mental health. But, once we acknowledge that Mai has no present-day mental health impairment, what justifies the deprivation of his fundamental right? Apparently, according to the court, Swedish statistical studies.

---

[6] As Judge VanDyke traces in his dissent, our court transplanted the "reasonable fit" standard from the First Amendment context, where it was used to evaluate *neutral*, *incidental* burdens on speech. VanDyke, J., dissenting at 46. I join Judge VanDyke in questioning whether this standard inappropriately waters down the exacting scrutiny required to review the complete deprivation of a fundamental right.

In justifying the "reasonable fit" between the government's objective here, the court relies on several ill-suited studies, many compiling data from foreign countries. One of the primary studies relied on by the court analyzed suicide risk after release from involuntary commitment, but offered no information about suicide risk for someone like Mai—20 years past his commitment and free of mental health issues.[7] *See also Tyler*, 837 F.3d at 696 (finding this same study insufficient to "explain why a lifetime ban [on gun possession] is reasonably necessary"). The court admits the inapplicability of this study to someone like Mai. *See Mai*, 952 F.3d at 1121. But undeterred, the court offers additional studies, perhaps even more inapplicable, such as a study focused on patients from Sweden,[8] "community care" patients from Italy and Australia,[9] an "[o]ut-patients"

---

[7] Of the patients considered, 98% were considered for only a year following their commitment, and the remaining 2% were studied from 2.5 to 8.5 years post-commitment. E. Clare Harris & Brian Barraclough, *Suicide as an Outcome for Mental Disorders: A Meta-Analysis*, 170 Brit. J. Psychiatry 205, 219 (1997) (hereinafter *"Meta-Analysis"*). The study doesn't include any research into the suicide risk at 10, 15, and 20 years out from commitment—even while recognizing that "[s]uicide risk seems highest at the beginning of treatment and diminishes thereafter." *Meta-Analysis* at 223.

[8] In one study of "[p]reviously hospitalised patients," 80% of the observations were from Sweden and involved all types of psychiatric diagnoses, not just depression. *See Mai,* 953 F.3d at 1118 (citing *Meta-Analysis* at 220–21); Allgulander C. et al., *Risk of Suicide by Psychiatric Diagnosis in Stockholm County. A Longitudinal Study of 80,970 Psychiatric Inpatients*, 241 Eur. Archives Psychiatry Clinical Neuroscience 323, 324 (1992); Appendix, Figure 1.

[9] In this study of "[c]ommunity care patients," 86% of observations were patients from Italy and Australia (the United States represented a mere 4% or three total observations). *Mai*, 952 F.3d at 1118 (citing

study with a meager 34 observations,[10] and another study of predominately foreign patients (with some U.S. data from 1969).[11]

The court offered no reasoned explanation of how a fundamental right can be contingent on off-point studies conducted overseas, *see Mai*, 952 F.3d at 1117–18 (relying on *Meta-Analysis*), despite the Supreme Court counseling against relying on such inapposite data. *See Craig*, 429 U.S. at 201.

The court's application of intermediate scrutiny here requires more of a rifle's precision, not a shotgun's spread. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc.*, 910 F.3d at 133–34 (Bibas, J., dissenting) ("Intermediate scrutiny requires more concrete and specific proof before the government may restrict any constitutional right, period."). The panel's cited studies fail to meet this standard because none demonstrate a "*continued* risk presented by people who were involuntarily committed many years ago and who have no history of intervening mental illness, criminal activity, or substance abuse." *Tyler*, 837 F.3d at 699. If we are to accede to the permanent deprivation of Mai's fundamental right, we should, at a minimum, demand evidence sufficiently tailored to his circumstances. *See id.* (remanding to the district court

---

*Meta-Analysis* at 221); *see* Appendix, Figure 2. The court doesn't even define "community care," much less its relevance to Mai.

[10] *Mai*, 252 F.3d at 1118 (citing Meta-Analysis at 220–21); *see* Appendix, Figure 3.

[11] *Mai*, 952 F.3d at 1118 (citing *Meta-Analysis* at 221); *see* Appendix, Figure 4.

to allow the government to present "additional evidence explaining the necessity of § 922(g)(4)'s lifetime ban").

## V.

Many years ago, judges took a turn as pseudo-psychologists and waded into whether a woman's mental health may be balanced against her constitutional rights. *See Buck v. Bell*, 274 U.S. 200 (1927). That case is generally not treated kindly today. I fear the court goes down the same path.

*Heller*'s endorsement of text, history, and tradition as the proper lens for evaluating the scope of the Second Amendment was not accidental. There, the Court emphatically disapproved of courts determining on an ad hoc basis whether certain individuals were undeserving of the full complement of fundamental rights. Duy Mai deserves better. Our Constitution deserves better. I respectfully dissent from the denial of rehearing en banc.

# APPENDIX

## Figure 1

**Table 14e**   Previously hospitalised patients – all psychiatric diagnoses

| Report/SMR | Country | Suicides | |
|---|---|---|---|
| | | Observed | Expected |
| Allgulander et al (1992) | Sweden | 1115 | 152.90* |
| Black et al (1985a) | USA | 68 | 3.21 |
| James & Levin (1964) | Australia | 75 | 14.21 |
| Temoche et al (1964) | USA | 147 | 32.40 |
| **SMR 693 (95% CI 657–73)** | **Total** | **1405** | **202.72** |

*Expected value calculated by us; SMR, standardised mortality ratio.

## Figure 2

**Table 14g**   Community care patients – all psychiatric diagnoses

| Report/SMR | Country | Suicides | |
|---|---|---|---|
| | | Observed | Expected |
| Amaddeo et al (1995) | Italy | 30 | 1.72 |
| Cantor et al (1992) | Australia | 34 | 3.00* |
| Corton et al (1991) | Belgium | 6 | 0.23 |
| Segal & Kotler (1991) | USA | 3 | 0.79* |
| Sturt (1983) | England | 1 | 0.04* |
| **SMR 1280 (95% CI 1111–1608)** | **Total** | **74** | **5.78** |

*Expected value calculated by us; SMR, standardised mortality ratio.

## Figure 3

**Table 14f**  Out-patients – all psychiatric diagnoses

| Report/SMR | Country | | Suicides | |
|---|---|---|---|---|
| | | | Observed | Expected |
| Beck et al (1990) | USA | | 17 | 1.12* |
| Koranyi (1977) | Canada | | 11 | 0.35 |
| Martin et al (1985) | USA | | 6 | 0.41 |
| **SMR 1809 (95% CI 1252–2527)** | | **Total** | **34** | **1.88** |

*Expected value calculated by us; SMR, standardised mortality ratio.

## Figure 4

**Table 14h**  All treatment settings – all psychiatric diagnoses

| | Country | | Suicides | |
|---|---|---|---|---|
| | | | Observed | Expected |
| Babigian & Odoroff (1969) | USA | | 133 | 14.73 |
| Hoenig & Hamilton (1966) | England | | 3 | 0.13* |
| Innes & Millar (1970) | Scotland | | 30 | 1.10 |
| King & Barraclough (1990) | England | | 77 | 4.10 |
| Rorsman (1974) | Sweden | | 49 | 5.20 |
| Old age | | | | |
| Robinson (1989) | England | | 1 | 0.17* |
| **SMR 1152 (95% CI 1024–1292)** | | **Total** | **293** | **25.43** |

*Expected value calculated by us; SMR, standardised mortality ratio.

VANDYKE, Circuit Judge, with whom BUMATAY, Circuit Judge, joins, dissenting from denial of rehearing en banc:

In the final paragraph of its opinion rejecting Mai's Second Amendment claim, the panel emphasized that "[w]e emphatically do not subscribe to the notion that 'once mentally ill, always so.'" *Mai v. United States*, 952 F.3d 1106, 1121 (9th Cir. 2020). I believe them. Yet just like the government's position in this case, the panel's decision inescapably effectuates exactly that ethic. How can this court purport to be applying "heightened" scrutiny, yet bless a legal position and practical outcome everyone insists isn't true?

The answer is a simple four-letter word: guns. It is hard to conceive of any other area of the law where, given the opportunity to apply heightened scrutiny, this court would countenance for a moment an outcome rooted in the scientifically indefensible, morally repugnant, and legally insufficient concept of "once mentally ill, always so." Mr. Mai could understandably take personally this court's labeling of him as a second-class citizen (more on that below). But he shouldn't. Our court cannot really believe that, just because a currently healthy individual decades ago suffered from mental illness, they are permanently relegated to a disfavored status impervious to even heightened scrutiny. Mr. Mai is not a second-class citizen—not in this court's eyes or anyone else's. He's just seeking to exercise a second-class right. He is another innocent casualty of this court's demonstrated dislike of things that go bang. Perhaps Mr. Mai can take faint solace in the fact that, were he seeking to exercise any other right entitled to heightened scrutiny, he would no doubt get the judicial review he plainly merits.

Mai, and all others who have overcome mental illness, deserve better than to be permanently designated second-class citizens, particularly as it relates to their equal participation in a *fundamental* right.  I therefore agree entirely with Judge Bumatay's dissent and write separately to expound on two of the reasons this case deserved en banc attention.

First, our en banc court should have reconsidered and corrected the panel's circular logic about *who* lies at the "core" of the Second Amendment.  By lumping individuals like Mai into overbroad groups that, as a whole, may pose heightened risks of violence, the panel has effectively given governments carte blanche to legislate the Second Amendment away.  The panel's classist approach labels many law-abiding, responsible citizens like Mai non-law-abiding, irresponsible citizens, outside the protections of the Second Amendment.  No evidence suggests Mai is mentally ill, yet the panel's rationale labels him so, for life.  The panel then uses this grouping to lower the applicable level of scrutiny, which in turn relaxes (or eliminates) the requirement that a restriction should substantially fit the government objective.  It's circular.  All this, when the "core" of the Second Amendment in *Heller* is about protected *conduct*—not people.

Second, our intermediate scrutiny jurisprudence is broken, at least as to Second Amendment claims.  We have appropriated a "reasonable fit" standard from the First Amendment context, where it was used to evaluate *neutral*, *incidental* burdens on speech.  Not only have we pilfered a test ill-suited to *direct* burdens on a *different* fundamental right, we have further diminished that already too-anemic test.  Our track record on the Second Amendment is quite

poor, and the analytical maltreatment exhibited again in this case only adds to the rap sheet.

# I.  ASSUMPTIONS, PRESUMPTIONS, AND THE "CORE" OF THE SECOND AMENDMENT RIGHT

## A.  The Panel's Awkward Assumption at *Chovan* Step 1

The panel sidestepped the difficult task of determining whether 18 U.S.C. § 922(g)(4) burdens Mai's Second Amendment rights (*Chovan* Step 1) by simply assuming it did.  *Mai*, 952 F.3d at 1114–15.  According to the panel, a restriction does not burden a Second Amendment right if it fits a presumptively lawful ban in *Heller* (felons or the mentally ill) or regulates conduct outside the scope of the Second Amendment.  *Id.* at 1114 (referencing *Unites States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013)).  Blanketly banning firearm possession clearly implicates the *scope* of the Second Amendment, so, if the panel had decided Mai's case at *Chovan* Step 1, it could only uphold § 922(g)(4) as applied to Mai by concluding that he is properly included amongst "the mentally ill."  Faced with either holding that Mai's past mental illness rendered him perpetually mentally ill (once mentally ill, always so) or admitting that Mai had the same Second Amendment right as any other law-abiding citizen, the panel punted.  *Id.* at 1115.  This "well-trodden" analytical technique is generally fine, but here the panel buried the lede in *Chovan* Step 1 to avoid the awkwardness of expressly saying up front what it implicitly concluded in *Chovan* Step 2, Prong 1: that Mr. Mai's long-ago mental illness forever excludes him from the community of "law-abiding, responsible citizens" under the Second Amendment (i.e., once mentally ill, always so).  *Chovan*, 735 F.3d at 1138.

## B. After Assuming the Statute Burdens Mai's Second Amendment Rights, the Panel Concluded Mai Is "Well Outside the Core of the Second Amendment."

*Chovan* Step 2 is a two-prong inquiry to determine the appropriate level of scrutiny: (1) how close the law comes to the core of the Second Amendment and (2) the severity of the law's burden on that right. *Chovan*, 735 F.3d at 1138. As to the second prong, the panel correctly recognized that § 922(g)(4) severely burdens Mai's Second Amendment right and amounts to a lifetime ban on firearm ownership. *Mai*, 952 F.3d at 1115.

This put all the pressure on the panel's Prong 2 "core" analysis. The panel first determined Mai was not a law-abiding, responsible citizen because of his *former* mental illness. *Id.* (likening Mai to domestic violence misdemeanants). From this, and despite § 922(g)(4)'s severe burden on Mai's Second Amendment rights, the panel concluded that § 922(g)(4) "falls well outside the core of the Second Amendment right." *Id*. The panel then deemed a lower level of scrutiny appropriate, because a "lifetime ban" on the formerly committed "burdens only a narrow class of individuals who are not at the core of the Second Amendment." *Id*.

The panel believes class-based categorical bans are permissible under intermediate scrutiny, so long as those bans target groups that pose a heightened risk of violence. *Id.* at 1116. Because some metrics indicate that individuals *recently* involuntarily committed are more violent than the general public, the panel surmises that the firearm ban, as applied to Mai (who was committed as a juvenile decades

ago), survives intermediate scrutiny.[1]  *Id.* at 1116–17.  But this standard abandons *any* reasonable fit requirement. Presumably, the panel's version of "intermediate scrutiny" would uphold firearm bans as applied to young men, the poor, or the entire 2008 Florida Gators football team.[2] Ironically, the *broader* the class, the more likely it is to pass this standard.  Suppose Congress instituted a firearm ban against *anyone who has committed a crime*—from jaywalkers to violent felons.    That "all criminals" classification would withstand scrutiny under the panel's standard because, when lumped together into one group, that group—as a whole—poses a heightened risk of violence just because *some* members of that group do.    Whether committing murder or activating the turn signal too late, under the panel's rationale, "all criminals" are no longer law-abiding, responsible citizens entitled to basic Second Amendment rights.

Of course, this is absurd and circular.  Step 1: Congress bans firearm possession for a broad class of people including some sub-class therein that poses a heightened risk of violence.  Step 2: Our court says the broad class is outside "core" of the Second Amendment.  Step 3: We say the

---

[1] For the reasons Judge Bumatay ably explains, those metrics' relevance to Mai's circumstances is dubious at best, and clearly insufficient to meet any form of heightened scrutiny with real teeth.

[2] As of 2013, 34% of the 2008 Florida Gators football team had been arrested.  Many were charged with violent crimes, including at least one who was convicted of a notorious murder.  *See* Greg Bishop, *Hernandez Among Many Who Found Trouble at Florida in the Meyer Years*, N.Y. TIMES (July 6, 2013), https://www.nytimes.com/2013/07/0 7/sports/ncaafootball/hernandez-among-many-arrested-at-florida-in-the -meyer-years.html.  But the team was also graced by model citizen Tim Tebow, who, I'm sure we can all agree, could be trusted to own a firearm (and probably raise our children).

individual in the broad class is also outside the core, even though no evidence says he belongs to a violent sub-class, and all the evidence suggests otherwise. Step 4: We lower the level of scrutiny and relax the "fit" requirement so that a wildly overbroad prohibition can be deemed "reasonable." This bootstrapping approach is an ingenious but insidious way to render the Second Amendment a paper tiger. *See Chovan*, 735 F.3d at 1148 (Bea, J., concurring) ("If … the terms 'law-abiding' and 'responsible' are not tied to 'felons' and 'mentally ill,' how are the lower courts to recognize the limits of the 'law-abiding, responsible citizen' standard?").

## C. The "Core" of the Second Amendment Right has Nothing to Do with Classes of People.

The panel references *Chovan* (which quotes from *Heller*) for the principle that "[t]he core of the Second Amendment is 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Id.* at 1115 (quoting *Chovan*, 735 F.3d at 1138). According to the panel, this supported its decision to subject different classes of people to different tiers of scrutiny. *Id.* But this "core" standard finds no support in and misrepresents *Heller*.

Although the panel concludes that certain privileged classes of people constitute the "core of the Second Amendment" (while, by extension, other classes like the one it lumped Mai into don't), the *Heller* Court never applied this test to the right's *holders*, but only to its *substance*. The word "core" appears only twice in *Heller* and both times describes the *activity* protected by the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 630 (2008) ("the *core* lawful purpose of self-defense") (emphasis added); *id.* at 634 (reasoning that handgun ownership is the "*core* protection" of the Second Amendment) (emphasis added).

*Heller* never used "core," or its like, to discuss the Second Amendment's application to individuals. But the panel nonetheless splices language—separated by fifty-four pages from *Heller*'s actual individual rights analysis—to support its claim that the formerly mentally ill lie outside the core of the Second Amendment. *See Mai*, 952 F.3d at 1115; *compare Heller*, 554 U.S. at 581 ("We move now from the holder of the right—'the people'—to the substance of the right ….") *with id.* at 635 ("And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.").

*Heller* actually cuts against the panel's supposition. The *Heller* Court noted that the six other constitutional provisions that guarantee rights to "the people" refer unambiguously to the same class of individuals: namely, "all members of the political community." *Id.* at 580 (First, Second, Fourth, Ninth, Tenth, and Seventeenth Amendments). *Heller* then concluded that "the Second Amendment right is [likewise] exercised individually and belongs to *all Americans*." *Id*. at 581 (emphasis added). Does the panel's contrary logic mean groups or individuals may also be placed outside the "core" of other constitutional rights?

I'm certain this court would say no. The Supreme Court has repeatedly declined to do so. Instead, it takes an all-or-nothing approach to delineate the scope of individuals included in a constitutional protection ***and then*** applies an appropriate level of scrutiny to the regulatory burden on the *substance* of that right, if necessary. *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 771 (2008) (holding that enemy combatants are entitled to the privilege of habeas corpus); *Demore v. Kim,* 538 U.S. 510, 531 (2003) (aliens not entitled

to bail hearings during removal proceedings under Due Process Clause); *Jones v. Helms*, 452 U.S. 412, 419–20 (1981) (convicted felons have no fundamental right to travel); *Richardson v. Ramirez*, 418 U.S. 24, 54–56 (1974) (states can prevent convicted felons from voting). Just this year, the Supreme Court reaffirmed this approach. *See Agency for Int'l Dev. v. All. for Open Soc'y. Intl., Inc.*, 140 S. Ct. 2082, 2086 (2020). There, the Court held that "foreign organizations operating abroad … possess no rights under the First Amendment." *Id*. at 2087. The foreign organizations' *status* didn't dictate the Court's selected tier of scrutiny—indeed, scrutiny appears nowhere in the decision. *Id.* at 2085–89. On the contrary, the Court's decision was categorical: the plaintiffs don't have First Amendment rights. *Id*. at 2087.

Our court, too, has generally refused to apply a *Mai*-style, second-class citizen "core" analysis to rights guaranteed to "the People." *See, e.g.*, *Rodriguez v. Swartz*, 899 F.3d 719, 730 (9th Cir. 2018) (extending the *full* protection of the Fourth Amendment to a Mexican citizen shot on Mexican soil by American officer on American soil), *cert. granted, judgment vacated*, 140 S. Ct. 1258 (2020); *Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001) (ruling that mentally disturbed individuals are protected by the Fourth Amendment right against excessive force); *Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1991) (per curiam) (holding that mentally ill individuals are *fully* protected by the Fourth Amendment), *as amended on denial of reh'g* (Apr. 1, 1992).

In this case, the panel invents a *class scrutiny* standard in order to quietly lump Mai into a class ("the mentally ill") to which it wouldn't explicitly consign him at *Chovan* Step 1. It then leverages intermediate scrutiny to allow it to ignore

the group's obvious overbreadth, thereby allowing anyone who has ever suffered from mental illness to be deprived of their Second Amendment rights for life, regardless of their present condition. Once mentally ill, always so. *But see Heller*, 554 U.S. at 634–35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not … future judges think that scope too broad."). Consistently applied, this class-based recharacterization about the "core" of the Second Amendment would bode ill for our foregoing scrutiny of laws burdening other fundamental rights. But we would never allow such subtle and slippery reasoning to so grievously burden the rights of "the People" protected elsewhere by the Constitution. This disparate treatment is unacceptable, even as applied to one of this circuit's least-favored constitutional provisions. By refusing to acknowledge that it is giving second-class treatment to the Second Amendment, the panel tragically relegates folks like Mai to permanent second-class status.

## II. LOWERING HEIGHTENED SCRUTINY

Of course, any concerns about the panel's circular class-based rationale bankrupting other constitutional rights is probably misplaced. This appears to be a "one-show-only" phenomenon specially reserved for the Second Amendment. Particularly in that context, we have watered down the "reasonable fit" prong of intermediate scrutiny to little more than rational basis review.

The panel cited circuit precedent when articulating the reasonable fit standard: "'the statute simply needs to promote a substantial government interest that would be achieved less effectively absent the regulation.'" *Mai*, 952 F.3d at 1116 (quoting *United States v. Torres*, 911 F.3d 1253, 1263 (2019)). Whatever kind of fit that requires, it

certainly isn't *reasonable*. A *grossly overbroad* regulation with just a *miniscule bit* more effectiveness meets that standard. A law that banned firearm ownership for "young men" or "anyone who has committed any crime" would meet that standard. Such a standard is an incomplete and incorrect tool for measuring regulations that facially burden a fundamental right.

The panel not only applies this inappropriate standard (*see* Section I, above), it applies it inappropriately. The "reasonable fit" language the panel relied upon was crafted for use in a specific, and very different, context: *facially neutral* regulations that *incidentally* burden freedom of speech in a way that is *no greater than is essential*. It's worth exploring how this standard stumbled its way from the First to the Second Amendment and arrived here.

## A. The "Reasonable Fit" Standard Is Born and Promptly Diluted.

The trail begins at the well-known *United States v. O'Brien*, where the Court dealt with a war protester who burned his draft card. 391 U.S. 367, 369 (1968). O'Brien argued the prohibition on burning draft cards violated his freedom of speech, *id.* at 370, while the government claimed it needed to ensure the ready accessibility of issued draft cards. *Id.* at 378. The Court reasoned:

> [W]e think it clear that a government regulation is sufficiently justified … if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the *incidental* restriction on alleged First Amendment freedoms is *no*

> *greater than is essential* to the furtherance of
> that interest.

*Id.* at 377 (emphasis added). The restriction in *O'Brien* was (a) incidental and (b) no greater than was essential to further an important or substantial government interest. Both qualifications are critical to the *O'Brien* test, but subsequent cases purporting to apply it neglected these qualifications.

In *United States v. Albertini*, the defendant argued his First Amendment rights were violated because he was banned from entering a military base and thereby prevented from peacefully protesting during an open house on Armed Forces Day that was generally open to the public. 472 U.S. 675, 677–78 (1985) (the defendant had previously improperly entered military bases and destroyed government documents). The Court disagreed: "an *incidental* burden on speech is *no greater than is essential*, and therefore is permissible under *O'Brien,* so long as the *neutral regulation* promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 689 (emphasis added).[3]

In *Ward v. Rock Against Racism*, musicians argued the denial of a permit to perform in a public space due to repeated past noise violations burdened their First Amendment rights. 491 U.S. 781, 785 (1989). Quoting from *Albertini*, the Court affirmed that a speech regulation must be:

---

[3] *Albertini*'s recitation of the *O'Brien* standard is confusing and probably oxymoronic. But even *Albertini*'s word jumble is a poor fit in Mai's case, where the regulation is neither incidental, nor neutral, nor "no greater than is essential."

> narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.

*Id.* at 798–99 (internal quotation marks omitted). *Ward* further clarified that the speech regulation may not "burden substantially more speech than is *necessary* to further the government's legitimate interests." *Id.* at 799 (emphasis added) ("Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals."). Yet while *Ward* explicitly described the regulation as a *content-neutral*, *incidental* burden on speech, *id.* at 791–92, it curiously omitted the word "neutral" from its *Albertini* quotation. *Compare id.* at 799 ("so long as the … regulation") *with Albertini*, 472 U.S. at 689 ("so long as the neutral regulation"). As a result, later cases citing *Ward* likewise fail to note that the test was crafted to analyze neutral, incidental burdens on speech.

We cited the *Ward* language in *Colacurcio v. City of Kent* to uphold a content-neutral, narrowly tailored regulation of nude dancing performances. 163 F.3d 545, 553 (9th Cir. 1998) (upholding ordinance requiring nude dancers to perform at least ten feet away from patrons for health and safety reasons). *Colacurcio* notably reaffirmed that a regulation evaluated under this test may not burden substantially more speech than necessary to further the government's interests. *Id.*

## B. The Ninth Circuit Leans into the Watered-Down Standard.

But things went sideways when we jumped from the First to the Second Amendment. In *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015), for the first time, we applied a *sub-Albertini* standard (lacking explicit *neutrality*, *incidental burden*, and *not substantially more burdensome than necessary* language) to a regulation that squarely and severely burdened the fundamental right to keep and bear arms. *Id.* at 1000. The *Fyock* plaintiffs challenged a regulation restricting possession of higher-capacity magazines under the Second Amendment. *Id.* at 994–95. The court upheld the restriction, holding that "[the government] was required to show *only that* [the regulation] promotes a 'substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* at 1000 (quoting *Colacurcio*, 163 F.3d at 553)) (emphasis added). And there it is. Quietly and fatally, we watered down a First Amendment "reasonable fit" requirement (of dubious value to the Second) to a Second Amendment test the government could drive a truck through.

Our cases have subsequently cited and applied *Fyock*'s (un)reasonable fit requirement.[4] But this isn't heightened scrutiny at all. Originally developed to analyze *neutral* regulations that *incidentally* burdened First Amendment

---

[4] *See, e.g.*, *Torres*, 911 F.3d at 1263; *United States v. Singh*, 924 F.3d 1030, 1057–58 (9th Cir. 2019), *cert. granted*, j*udgment vacated sub nom. Azano Matsura v. United States*, 140 S. Ct. 991 (2020), and *cert. denied*, 140 S. Ct. 1265 (2020); *Pena v. Lindley*, 898 F.3d 969, 979 (9th Cir. 2018); *Mahoney v. Sessions*, 871 F.3d 873, 882–83 (9th Cir. 2017); *Bauer v. Becerra*, 858 F.3d 1216, 1226–27 (9th Cir. 2017); *Silvester v. Harris*, 843 F.3d 816, 829 (9th Cir. 2016).

rights in a way that was *no greater than was essential*, this test would have been a poor fit for direct restrictions on Second Amendment rights (i.e., 18 U.S.C. § 922(g)(4)) even if we hadn't plied it with diazepam.

## C. The Panel Doubles Down on "Relaxed" Heightened Scrutiny.

*Mai* quotes *Torres*, which quoted *Fyock*, and that's how we arrived at our present predicament. *Mai*, 952 F.3d at 1116 (quoting *Torres*, 911 F.3d at 1263 (upholding prohibition on illegal aliens possessing firearms)). In our Second Amendment cases, therefore, a reasonable fit under intermediate scrutiny demands *only* that the regulation "simply needs to 'promote[] a substantial government interest that would be achieved less effectively absent the regulation.'" *Torres*, 911 F.3d at 1263 (quoting *Fyock*, 779 F.3d at 1000) (quotation marks omitted); *Mai*, 952 F.3d at 1116. The result? The end of *any* regulatory tailoring and the advent of limitless regulatory overbreadth.

There was a glimmer of good sense in *Young v. Hawaii*, where a panel of our court held that the Second Amendment "encompasses the right of a responsible law-abiding citizen to carry a firearm openly for self-defense outside of the home." 896 F.3d 1044, 1048 (9th Cir. 2018), *reh'g en banc granted*, 915 F.3d 681 (9th Cir. 2019). That panel astutely recognized and avoided the same problem we see in *Mai*—that the reasonable fit standard was significantly weaker than it ought to be:

> According to the dissent, the only question a court must answer under intermediate scrutiny is whether the government action promotes a substantial government interest that would be achieved less effectively absent

the regulation. That is incomplete, because *a court must also determine whether the government action burdens substantially more protected conduct than is necessary to further that interest.* Thus, while intermediate scrutiny surely does not require the government to pursue the *least* restrictive means of achieving an important interest, the substantial overbreadth or impreciseness of a government action must be considered.

*Id.* 1072–73 (cleaned up; internal citations omitted) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 213–14, (1997)). Refreshing indeed—an insistence that *overbreadth* be a salient consideration in the reasonable fit analysis! But our en banc court reasserted our errant orthodoxy and vacated *Young*. *Young v. Hawaii*, 915 F.3d 681, 682 (9th Cir. 2019).

In *Mai*'s as-applied challenge, § 922(g)(4) clearly burdens substantially more protected conduct than is necessary to advance Congress's interests (disarming "*the* mentally ill"). The statute's permanent, total burden on Mai's Second Amendment right is far more restrictive than necessary to further the government's interest in preventing gun violence. Yet the panel and the precedent it cites simply omit that additional prong of the test.

Instead, the panel applied our court's adulterated and incomplete version of the "reasonable fit" standard—a standard that in its current form (with our downward modifications) is unfit to size up even *neutral* regulations that incidentally burden free speech rights. But basic logic (constitutional and otherwise) tells us that we should demand a closer regulatory fit for a law that *directly* burdens a

fundamental right than that which imposes *neutral*, *incidental* burdens on a fundamental right. If the panel had undertaken real heightened scrutiny, or even just faithfully applied the test as articulated in *O'Brien*, *Albertini*, *Ward*, or *Colacurcio*, § 922(g)(4) could not have withstood Mai's challenge.

It's time to face reality: the requirement we applied in *Fyock*, *Torres*, and *Mai* is no requirement at all. Government burdens on the Second Amendment may not always need to fit into skinny jeans, but they should never come dressed in clown pants. The current "reasonable fit" standard makes it embarrassingly easy for the government to sustain its regulations. Heightened scrutiny should have some, well, height. Our en banc court spurned a golden opportunity to reaffirm that intermediate scrutiny is, indeed, a form of *heightened* scrutiny.

## D. This Circuit Treats the Second Amendment Like a Second-Class Constitutional Right.[5]

To the rational observer, it is apparent that our court just doesn't like the Second Amendment very much. We always uphold restrictions on the Second Amendment right to keep and bear arms.[6] Show me a burden—any burden—on

---

[5] *See Peruta v. Cty. of San Diego*, 824 F.3d 919, 945 (9th Cir. 2016) (en banc) (Callahan, J., dissenting) ("The Second Amendment is not a 'second-class' constitutional guarantee." (citing *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010))).

[6] *See, e.g.*, *Torres*, 911 F.3d at 1264–65 (upholding ban on illegal aliens possessing firearms); *Pena*, 898 F.3d at 973 (upholding ban on purchasing particular firearms); *Mahoney*, 871 F.3d at 883 (upholding limitations on police officers using department-issued firearms); *Bauer*, 858 F.3d at 1227 (upholding use of firearm sales fees to fund

Second Amendment rights, and this court will find a way to uphold it. Even when our panels have struck down laws that violate the Second Amendment, our court rushes in en banc to reverse course. *See, e.g.*, *Teixeira v. County of Alameda*, 873 F.3d 670, 690 (9th Cir. 2017) (en banc) (reversing panel's invalidation of a regulation prohibiting the right to purchase and sell firearms); *Peruta v. County of San Diego*, 824 F.3d 919, 942 (9th Cir. 2016) (en banc) (reversing panel's invalidation of city law requiring showing of special self-defense need to obtain conceal carry permit where open carry was also prohibited); *Young v. Hawaii*, 896 F.3d 1044, 1074 (9th Cir. 2018) (discussed above), *reh'g en banc granted*, 915 F.3d 681 (9th Cir. 2019).**[7]**  Other rights don't

---

enforcement efforts against illegal firearm purchasers); *Silvester*, 843 F.3d at 829 (upholding 10-day waiting period for purchasers who have already cleared a background check in less than 10 days); *Fyock*, 779 F.3d at 1001 (upholding city's ban on high-capacity magazines); *Jackson v. City & County of San Francisco*, 746 F.3d 953, 970 (9th Cir. 2014) (upholding city's firearm and ammunition regulations); *Chovan*, 735 F.3d at 1142 (upholding ban on domestic violence misdemeanants owning firearms despite not committing domestic violence for 15 years); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (upholding ban on felons possessing firearms).

**[7]** Very recently, a panel of our court struck down another California regulation as violating the Second Amendment. *See Duncan v. Becerra*, No. 19-55376, 2020 WL 4730668, at *2 (9th Cir. Aug. 14, 2020). Given our court's history recounted above, court observers are of course already forecasting an inevitable en banc reversal. *See*, *e.g.*, Don Thompson, *9th Circuit ends California ban on high-capacity magazines*, WASH. POST (Aug. 14, 2020) ("We expect an en banc panel will rehear the case and correct this … out-of-step decision.") (source omitted), https://www.washingtonpost.com/national/9th-circuit-ends-california-ban-on-high-capacity-magazines/2020/08/14/f77751cc-de52-11ea-b4f1-25b762cdbbf4_story.html.

receive such harsh treatment.**[8]**  There exists on our court a clear bias—a real prejudice—against the Second Amendment and those appealing to it.  That's wrong.  Equal justice should mean *equal* justice.

## III.  CONCLUSION

The panel's bootstrapping, class-based approach to defining those at the "core" of the Second Amendment is unjust and antithetical to controlling case law.  Here, our court's unacknowledged antipathy toward the Second Amendment forced the panel into the unenviable position of condoning the perverse result of "once mentally ill, always so," notwithstanding its authentic disapproval of that obviously immoral canard.

Our toothless "heightened" scrutiny of Second Amendment restrictions is broken, and not accidentally so.

---

**[8]** *See e.g.*, *Nat'l Inst. of Family & Life Advocs. v. Harris*, 839 F.3d 823, 845 (9th Cir. 2016) (holding law requiring anti-abortion pregnancy centers to provide notice of publicly funded family-planning services, including abortions, did not violate First Amendment), *rev'd and remanded sub nom. Nat'l Inst. of Family & Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018); *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1179 (9th Cir. 2018) (holding California statute prohibiting retailers from imposing surcharge on payments by credit card violated First Amendment); *Latta v. Otter*, 771 F.3d 456, 476 (9th Cir. 2014) (holding states' anti-gay marriage laws violated Equal Protection Clause and due process); *deLaurier v. San Diego Unified Sch. Dist.*, 588 F.2d 674, 684 (9th Cir. 1978) (holding school district's mandatory maternity leave policy did not violate Equal Protection Clause); *Valley Broad. Co. v. United States*, 107 F.3d 1328, 1336 (9th Cir. 1997) (holding federal ban prohibiting broadcast advertisements of casino gambling violated First Amendment); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (holding "state program setting goals for ethnic and sex characteristics of construction subcontractors" violated Equal Protection Clause).

But Second Amendment rights are fundamental, and litigants attempting to vindicate theirs deserve better than what we're currently offering, for "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634.

I respectfully dissent.